*Lee Boyd Malvo v. State of Maryland*
No. 29, September Term, 2021.

**Criminal Procedure – Constitutional Law – Sentencing of Juvenile Offender – Homicide.**  Recent Supreme Court decisions have held that the Eighth Amendment to the United States Constitution does not permit a sentence of life without parole for a juvenile offender convicted of homicide if the sentencing court determines that the offender's crime was the result of transient immaturity, as opposed to permanent incorrigibility.  That constitutional constraint applies retroactively.  However, a court that imposes a sentence in a discretionary sentencing regime need not make an explicit finding as to a juvenile offender's incorrigibility.  In a case where sentencing took place prior to the recent Supreme Court decisions and where the sentencing judge may have determined that the defendant was not permanently incorrigible, the defendant is entitled to be resentenced to ensure compliance with the Eighth Amendment.  The terms of that sentence remain within the discretion of the sentencing court.

**Criminal Procedure – Sentencing of Juvenile Offender – Juvenile Restoration Act.**  Under the Juvenile Restoration Act ("JUVRA"), a juvenile offender who was convicted as an adult and who is serving a sentence that was imposed before October 1, 2021 may file a motion for reduction of sentence after serving 20 years of the sentence.  JUVRA likely provides the "meaningful opportunity for release" required for most such offenders under the Supreme Court's recent decisions interpreting the Eighth Amendment.  However, in the specific case of a juvenile offender serving multiple consecutive sentences of life without parole that were imposed prior to the Supreme Court decisions, and where the sentencing court could not have determined whether, under those decisions, the offender was one of the few offenders *not* entitled to a meaningful opportunity for release, JUVRA is not a substitute for resentencing.

Circuit Court for Montgomery County
Case No. 102675C
Argued: February 8, 2022

IN THE COURT OF APPEALS
OF MARYLAND

No. 29

September Term, 2021

_____

LEE BOYD MALVO

v.

STATE OF MARYLAND

_____

*Getty, C.J.,
*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Opinion by McDonald, J.
Watts, Hotten, and Gould, JJ., dissent.

_____

Filed: August 26, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Maryland Constitution, Article IV, §3A, they also participated in the decision and the adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

To be legal, a sentence in a criminal case must be consistent both with the law governing the offense for which the defendant was convicted and with the Eighth Amendment's proscription against "cruel and unusual" punishments. During the past two decades, the United States Supreme Court has issued several decisions elaborating on the application of the Eighth Amendment to juvenile offenders sentenced as adults. This case concerns whether a juvenile offender who was sentenced prior to key decisions pertinent to his situation should be resentenced to ensure that his sentence complies with the Constitution and therefore is legal.

Over the course of three weeks in October 2002, Petitioner Lee Boyd Malvo, then age 17, and John Allen Muhammad, then age 41, committed a series of murders in the greater Washington, D.C. area, primarily by shooting a high-powered rifle while concealed in the trunk of a modified automobile so as to terrorize the area of the country in which Mr. Muhammad's ex-wife lived. These crimes received considerable national media attention and became known as the "DC sniper attacks."

Mr. Malvo and Mr. Muhammad were charged with multiple counts of murder and other crimes in Virginia and Maryland. In Virginia, Mr. Malvo was convicted on four counts of first-degree murder. In Maryland, Mr. Malvo voluntarily testified against Mr. Muhammad and, in 2006, pled guilty to six counts of first-degree murder in the Circuit Court for Montgomery County. At his sentencing that year, the prosecutor stated that Mr. Malvo, once under the sway of an "evil man," had changed and "grown tremendously" since his participation in the crimes. The sentencing court similarly acknowledged Mr.

2

Malvo's cooperation with law enforcement, his remorse, and his transformation since he was arrested. The court sentenced Mr. Malvo to the maximum sentence of six terms of life in prison without the possibility of parole, to run consecutively to each other and to the four sentences of life without parole that he was serving in Virginia.

Mr. Malvo's sentence was consistent with the pertinent State statute and with the advisory State sentencing guidelines at that time. Since then, however, the Supreme Court has held that the Eighth Amendment does not permit a sentence of life without parole for a juvenile homicide offender if a sentencing court determines that the offender's crime was the result of transient immaturity, as opposed to permanent incorrigibility.[1] The Supreme Court has further held that this constraint applies retroactively and, thus, it applies to Mr. Malvo's case.

In 2017, Mr. Malvo filed a motion to correct an illegal sentence, based in part on the ground that the sentencing court did not have the benefit of the subsequent, but retroactive, Supreme Court decisions at the time he was sentenced. The Circuit Court for Montgomery County denied the motion.

This case presents the question whether ambiguity in a sentencing court's remarks about a juvenile offender's post-offense conduct and character, when made before the Supreme Court issued the decisions that govern the sentencing of a juvenile offender to life without the possibility of parole, rendered such a sentence illegal under the Eighth

---

[1] *Miller v. Alabama*, 567 U.S. 460 (2012); *Montgomery v. Louisiana*, 577 U.S. 190 (2016) (holding that the incorrigibility standard is retroactive); *Jones v. Mississippi*, 141 S. Ct. 1307 (2021) (reaffirming *Miller* and *Montgomery* while holding that a sentencing court need not make a specific finding of incorrigibility).

Amendment. Based on the record of this case, opposing inferences can be drawn as to whether the sentencing judge determined that Mr. Malvo was not "the rare juvenile offender whose crime reflects irreparable corruption" for whom the Eighth Amendment allows a sentence of life without parole. If the sentencing judge reached that conclusion, the sentence failed to comport with the Constitution. In light of this ambiguity, Mr. Malvo must be resentenced.

As a practical matter, this may be an academic question in Mr. Malvo's case, as he would first have to be granted parole in Virginia before his consecutive life sentences in Maryland even begin. Ultimately, it is not for this Court to decide the appropriate sentence for Mr. Malvo or whether he should ever be released from his Maryland sentences. We hold only that the Eighth Amendment requires that he receive a new sentencing hearing at which the sentencing court, now cognizant of the principles elucidated by the Supreme Court, is able to consider whether or not he is constitutionally eligible for life without parole under those decisions.

# I

## Background

### A. *Limits on the Punishment of Juvenile Offenders*

1. Limits under the Eighth Amendment to the United States Constitution

The Eighth Amendment to the United States Constitution forbids the imposition of "cruel and unusual" punishments. The Supreme Court has explained that giving effect to the provision's guarantee requires "referring to the evolving standards of decency that mark the progress of a maturing society to determine which punishments are so disproportionate

3

as to be cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (citation and internal quotation marks omitted). "This is because the standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." *Graham v. Florida*, 560 U.S. 48, 58 (2010) (citation and internal quotation marks omitted).

In recent years, the Supreme Court has issued a series of decisions applying this Eighth Amendment standard in the context of juvenile offenders sentenced to severe punishments in the criminal justice system. As recounted in Part I.B.4 of this opinion, Mr. Malvo's sentencing occurred in late 2006 near the beginning of this series of decisions and preceded a number of decisions significant to the resolution of this case.

*Supreme Court Precedent as of 2006*

In 2005, *Roper* was the first in the Supreme Court's series of decisions concerning the application of the Eighth Amendment to the sentencing of juvenile offenders. There, the Court held that the Eighth Amendment forbids the execution of an offender who committed the crime when younger than 18 years old. 543 U.S. at 568. The Court noted that a majority of states had already banned the punishment and emphasized that "three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 569. Specifically, those differences are (1) juveniles' lack of maturity and an underdeveloped sense of responsibility resulting in "impetuous and ill-considered actions and decisions"; (2) juveniles' greater vulnerability or susceptibility to negative influences and outside pressures; and (3) the more mutable nature of juveniles' character and personality traits.

4

*Id.* at 569-70. In light of these differences, the Court determined that the two distinct social purposes served by the death penalty – retribution and deterrence – apply to juveniles with lesser force than to adults. *Id.* at 570. In rejecting the argument that juveniles' reduced culpability can be adequately considered on a case-by-case basis, the Court identified an "unacceptable likelihood … that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth … even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death." *Id.* at 572-73.

*Supreme Court Precedent after 2006*

*Roper* dealt exclusively with the death penalty. Five years later, in 2010 – four years after Mr. Malvo's sentencing – the Supreme Court first declared that the Eighth Amendment also imposes constraints on the imposition of a life without parole sentence on a juvenile offender. In *Graham v. Florida*, 560 U.S. 48, 59, 74 (2010), the Court held that the Constitution forbids sentencing a juvenile non-homicide offender to life without parole, announcing for the first time a categorical restriction under the Eighth Amendment on a punishment other than the death penalty. The Court noted that "life without parole sentences share some characteristics with death sentences" in that they "alter[] the offender's life by a forfeiture that is irrevocable." *Id.* at 69. Such sentences are particularly harsh when imposed on a juvenile offender, who will "on average serve more years and a greater percentage of his life in prison than an adult offender." *Id.* at 70.

In addition to identifying a national and international consensus against sentencing juvenile non-homicide offenders to die in prison, the *Graham* Court returned to the

5

discussion of juvenile culpability that it began in *Roper*. 560 U.S. at 62, 80. In a review of the four legitimate penological objectives – retribution, deterrence, incapacitation, and rehabilitation – the Court found that none justified a life without parole sentence for a juvenile not convicted of murder. *Id.* at 71. Such offenders must instead have a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75.

Two years later, in the first of a trilogy of decisions that are particularly relevant to this case, the Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller v. Alabama*, 567 U.S. 460, 479 (2012). The Court reiterated the three general differences between juveniles and adults first articulated in *Roper* – immaturity, susceptibility to negative influences, and mutability – and extended the reach of its reasoning in *Graham*: "[N]one of what [*Graham*] said about children – about their distinctive (and transitory) mental traits and environmental vulnerabilities – is crime specific. … So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses. Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole." *Id.* at 473. Thus, mandatory sentencing schemes that "remov[e] youth from the balance" contravene the "foundational principle" of *Graham* and *Roper*: "that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at 474.

6

The Court went on to articulate some of the mitigating circumstances that mandatory sentences fail to account for:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

567 U.S. at 477-78. In the Court's view, occasions for sentencing juveniles to life without parole "will be uncommon" due to the difficulty inherent in distinguishing between juvenile offenders whose crimes reflect transient immaturity and those whose crimes reflect irreparable corruption. *Id.* at 478-80. Before a sentencing court could make that judgment, the Court required that it "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480.

In 2016, 10 years after Mr. Malvo's sentencing, the Supreme Court clarified that *Miller* announced a substantive rule of constitutional law with retroactive effect. *Montgomery v. Louisiana*, 577 U.S. 190 (2016). In *Montgomery*, the Court rejected the argument that *Miller* merely announced a new rule of procedure that applied prospectively. Instead, it held that the *procedural* component of *Miller* – "a hearing where youth and its attendant characteristics are considered as sentencing factors" – is the means of

7

implementing its *substantive* guarantee – "that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at 209-10 (internal quotation marks omitted). The Court explained that even though "*Miller* did not impose a formal factfinding requirement," it "does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Id.* at 211.

In 2021, after Mr. Malvo had filed a motion to correct an illegal sentence, the Supreme Court returned yet again to the topic of juvenile life-without-parole sentencing, this time to clarify the procedural component of *Miller*. In *Jones v. Mississippi*, 141 S. Ct. 1307, 1313 (2021), the Court held that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." The petitioner in *Jones* had been given a mandatory life-without-parole sentence for a homicide he committed as a juvenile. After *Miller* was decided, he received a new sentencing hearing, at which his counsel argued that he was not the rare, irreparably corrupt juvenile offender. The sentencing judge acknowledged the Supreme Court's holding in *Miller* and his own sentencing discretion, but imposed the same life-without-parole sentence. *Id.*

On appeal, Jones argued that a sentencing court must make either an explicit or implicit finding of permanent incorrigibility before it can constitutionally sentence a juvenile homicide offender to life without parole. The Supreme Court disagreed, explaining that "if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth, especially if defense counsel

8

advances an argument based on the defendant's youth." *Id.* at 1319 (emphasis in original). In the context of that case, the Court essentially concluded that the fact of the sentencing court's authority to exercise discretion as to whether to make parole available when sentencing a juvenile to life imprisonment, paired with the imposition of a life-without-parole sentence, is itself an implicit finding of incorrigibility.

The Court did not have occasion to address a situation in which a sentencing court finds that a crime was the result of the offender's transient immaturity but nonetheless sentences the offender to life without parole. Although the Court's opinion in *Jones* focused almost exclusively on *Miller*'s procedural component, it explicitly did "not disturb *Montgomery*'s holding that *Miller* applies retroactively on collateral review[,]" 141 S. Ct. at 1317 n.4, a holding that was based on the *Montgomery* Court's conclusion that *Miller* announced a new substantive rule. In a footnote, the *Jones* Court quoted *Montgomery*'s "key paragraph," which included the passage indicating that a court is not "free to sentence a child whose crime reflects transient immaturity to life without parole." *Id.* at 1315 n.2, quoting *Montgomery*, 577 U.S. at 211. Because *Miller*'s substantive holding, as articulated in *Montgomery*, remains good law, it follows that an offender deemed corrigible cannot constitutionally be sentenced to life without the possibility of parole.

2.      Maryland Juvenile Restoration Act

The General Assembly enacted the Juvenile Restoration Act ("JUVRA") in 2021. Chapter 61, Laws of Maryland 2021. JUVRA made three significant changes to Maryland's sentencing practices for juvenile offenders convicted as adults. Specifically, it gave sentencing courts discretion to impose sentences less than the minimum required

by law, prospectively banned sentences of life without the possibility of parole, and authorized offenders sentenced before October 1, 2021 who have spent more than 20 years in prison to file a motion to reduce their remaining sentence. Maryland Code, Criminal Procedure Article ("CP"), §§6-235, 8-110. Only the final provision is relevant here.

An eligible offender who files a motion to reduce the offender's remaining sentence is entitled to a hearing at which the offender must be present, either in person or by video. CP §8-110(b). Notice of the hearing must be given to the victim or the victim's representative. *Id.* Both the offender and the State may introduce evidence in support of or in opposition to the motion. *Id.* Following the hearing, the court may reduce the duration of the offender's sentence if it concludes that (1) the individual is not a danger to the public; and (2) the interests of justice will be better served by a reduced sentence. CP §8-110(c). The statute outlines 10 factors – as well as "any other factor the court deems relevant" – that a court is to consider and address in a written decision, including: the individual's age at the time of the offense; the nature of the offense and the history and characteristics of the individual; any statement offered by or on behalf of a victim of the offense; the extent of the individual's role in the offense and whether and to what extent an adult was involved in the offense; the diminished culpability of a juvenile as compared to an adult; and whether the individual has demonstrated maturity, rehabilitation, and fitness to reenter society. CP §8-110(d). If the offender's motion is denied or granted in part, the offender may file another motion after three years. A third and final motion can be filed after an additional three-year waiting period. CP §8-110(f). Relief sought under JUVRA is distinct from and

10

does not affect other terms of the sentence, such as the offender's opportunity to seek parole.

### B. Facts and Proceedings

#### 1. The Homicides

Mr. Malvo was born in Kingston, Jamaica, in 1985. In 2000, at the age of 15, he met Mr. Muhammad, a Gulf War veteran and United States citizen, in Antigua. At the time, Mr. Muhammad was engaged in a custody dispute concerning his own children. In May 2001, Mr. Muhammad brought Mr. Malvo to the United States. In February 2002, Mr. Muhammad and Mr. Malvo set out to find Mr. Muhammad's children. They also embarked on a series of shootings that would leave at least 12 people dead. They shot people at random, usually with a high-powered rifle while concealed in the trunk of Mr. Muhammad's modified Chevy Caprice. Apparently, the purpose was to terrorize the area of the country in which Mr. Muhammad's ex-wife lived.[2]

In July 2002, Mr. Muhammad learned that his children were living in Clinton, Maryland. On September 5, 2002, Mr. Malvo shot and robbed a man in Clinton. Ten days later, Mr. Malvo shot another man in Clinton. Neither victim died.[3] Mr. Malvo and Mr. Muhammad then traveled to Montgomery, Alabama, where, on September 21, 2002, Mr.

---

[2] *Muhammad v. Commonwealth*, 619 S.E.2d 16, 37 (Va. 2005). Many of the facts concerning the offenses and prosecutions of Mr. Muhammad and Mr. Malvo are also described in *Muhammad v. State*, 177 Md. App. 188 (2007), *cert. denied*, 401 Md. 614 (2008); *Muhammad v. Kelly*, 575 F.3d 359 (4th Cir. 2009); and *Malvo v. Mathena*, 893 F.3d 265 (4th Cir. 2018).

[3] *Mathena*, 893 F.3d at 267.

Muhammad shot two women as they closed up a liquor store. One of the women died. Police officers responding to the scene reportedly saw Mr. Malvo going through the victims' purses and gave chase, but he was able to evade capture. However, he left behind evidence that would eventually tie him and Mr. Muhammad to the crimes, including the pistol used in the two Clinton shootings.[4] On September 23, 2002, the manager of a beauty salon was shot and killed in a Baton Rouge parking lot. Police later determined that the fatal bullet was fired from the same Bushmaster rifle later found in Mr. Muhammad's car when he and Mr. Malvo were ultimately apprehended in Maryland. Witnesses reportedly saw Mr. Malvo fleeing the scene.[5]

The pair then returned to the Washington, D.C. area, where they shot 13 people between October 2 and October 22, 2002. Ten were killed. All were struck by a single bullet fired from a distance. On October 24, 2002, Mr. Muhammad and Mr. Malvo were apprehended while sleeping in their vehicle at a rest stop in Frederick County.[6] Initially, following his apprehension, Mr. Malvo referred to Mr. Muhammad as "his father" and told authorities that he had pulled the trigger in 10 of the shootings. In his testimony four years later at Mr. Muhammad's trial in Maryland, he said that he had generally functioned as the "spotter" and that Mr. Muhammad was usually the shooter in the attacks.[7]

---

[4] *Kelly,* 575 F.3d at 362.

[5] *Mathena*, 893 F.3d at 267-68.

[6] *Mathena*, 893 F.3d at 268.

[7] Appendix A, pp. 10-11.

On October 25, 2002, a Statement of Charges was filed against Mr. Malvo in the District Court in Montgomery County. It consisted of six charges of first-degree murder. That charging document was superseded on June 16, 2005, when he and Mr. Muhammad were indicted by a grand jury in the Circuit Court for Montgomery County on the same six counts.

2.      Trial and Guilty Pleas

Mr. Malvo and Mr. Muhammad had also been charged with homicide and related offenses in Virginia, and those charges were tried first. Trial on the Virginia charges against Mr. Malvo took place in November and December of 2003. Mr. Malvo's attorneys presented an insanity defense on the theory that he had been controlled by Mr. Muhammad.[8] Calling more than 40 witnesses, defense counsel painted a portrait of Mr. Malvo's upbringing and relationship with Mr. Muhammad. However, the jury rejected the insanity defense and Mr. Malvo was convicted of the two murder charges and a firearms charge. In the sentencing phase of the case before the jury in March 2004, the prosecution

---

[8] Mr. Muhammad was tried separately in Virginia on essentially the same charges. He was convicted and sentenced to the death penalty. The convictions and sentence were affirmed on appeal. *Muhammad v. Commonwealth*, *supra*. He was executed in November 2009. Ian Urbina, *Sniper Who Killed 10 is Executed in Virginia*, NEW YORK TIMES (Nov. 10, 2009), available at https://perma.cc/G86B-NRWX.

sought the death penalty,[9] but the jury recommended, and the court imposed, two terms of life in prison without parole.[10]

In October 2004, Mr. Malvo entered an *Alford* plea,[11] pursuant to a plea agreement, to additional murder and firearms counts in a different county in Virginia. As part of the plea agreement, he was sentenced to two additional terms of life without parole plus eight years.[12]

Prior to the resolution of his own charges in Maryland, Mr. Malvo offered to testify against Mr. Muhammad at the latter's trial in the Circuit Court for Montgomery County.[13] At that trial, which took place in May 2006, Mr. Malvo testified voluntarily, without a plea deal, on behalf of the State. He testified for nearly two full days and gave a detailed account of his travels with Mr. Muhammad and their crime spree.[14] In affirming Mr. Muhammad's conviction, the Court of Special Appeals noted that much of what Mr. Malvo testified to

---

[9] The sentencing preceded the 2005 *Roper* decision that held that the death penalty may not be constitutionally imposed on juvenile offenders.

[10] *Mathena*, 893 F.3d at 268-69.

[11] An *Alford* plea is the "functional equivalent" of a guilty plea without an actual admission of guilt. *Bishop v. State*, 417 Md. 1, 20 (2010); *see also North Carolina v. Alford*, 400 U.S. 25 (1970).

[12] *Mathena*, 893 F.3d at 269-70.

[13] Mr. Muhammad had been extradited to Maryland while awaiting execution in Virginia. At the trial in Maryland, Mr. Muhammad was convicted on all six counts and sentenced to life without parole on each of the six counts, to be served consecutively to each other and to the sentences imposed in Virginia. *Muhammad*, 177 Md. App. at 199.

[14] *Muhammad*, 177 Md. App. at 217-22.

was otherwise unknown to the police. *Muhammad v. State*, 177 Md. App. at 221. It further noted that the only inconsistency in his testimony with prior statements to law enforcement was that he had previously claimed to be the triggerman in all of the shootings, in accordance with Mr. Muhammad's direction that Mr. Malvo claim responsibility, while at trial he admitted to pulling the trigger in two of the shootings. *Id*. at 221-22.

Several months later, on October 10, 2006, Mr. Malvo pled guilty to all six charges of first-degree murder pending against him in the Circuit Court for Montgomery County. The prosecutor informed the court that the guilty pleas were not induced by any concessions by the State – in other words, there was no plea deal. Mr. Malvo agreed with the State's statement of facts concerning the six murders, as set forth in Appendix A to this opinion. Sentencing was scheduled for a month later.

3.      Investigation of Mr. Malvo's Background

In preparation for Mr. Malvo's sentencing, his defense counsel sought to provide the court with information concerning Mr. Malvo's background, his bond with Mr. Muhammad, his break with Mr. Muhammad, and the developments that led him to testify against Mr. Muhammad and to plead guilty to all charges in Maryland without a deal with the State. Counsel commissioned a detailed report from a licensed clinical social worker and submitted that report to the sentencing court, together with a report by a forensic

psychiatrist that had been completed three years earlier in connection with the Virginia case.[15]  Both are contained in Appendix B to this opinion.

According to the report of the forensic psychiatrist, Mr. Malvo's parents separated when he was five years old, after which he rarely saw his father.  His mother was later diagnosed with bipolar disorder.  Beginning when he was nine years old, his mother left him in the care of others for extended periods of time while she pursued work elsewhere in the Caribbean.  Mr. Malvo suffered physical and emotional abuse during this period and began displaying symptoms of clinical depression.

In the fall of 2000, Mr. Malvo met Mr. Muhammad in Antigua.  Mr. Muhammad had absconded to the island with his children in the midst of a custody dispute.  Mr. Malvo's mother purchased fraudulent citizenship documents from Mr. Muhammad and moved to the United States in December 2000.  Mr. Malvo then moved in with Mr. Muhammad, who quickly gained significant influence over Mr. Malvo.  During this time, the 15-year-old Malvo adopted Mr. Muhammad's religion and accent, began referring to himself as "John Lee Muhammad," and underwent rigorous physical and ideological training by Mr. Muhammad.  In May 2001, Mr. Muhammad took Mr. Malvo to Florida, where Mr. Malvo was reunited with his mother.

---

[15] According to the report, the forensic psychiatrist personally interviewed Mr. Malvo on 20 occasions, conducted 11 phone interviews with key figures in Mr. Malvo's life, reviewed tapes or transcripts of more than 50 additional interviews conducted by defense investigators and mitigation specialists, and reviewed other records and discovery relevant to the case.

16

Mr. Malvo believed that his best chance of becoming a United States citizen was to be adopted by Mr. Muhammad. In October 2001, he left Florida to join Mr. Muhammad, who had since lost custody of his own children, in Washington State. There, his relationship with Mr. Muhammad deepened. In December 2001, Mr. Malvo and his mother – who had travelled to Washington State to attempt to pry her son away from Mr. Muhammad – were arrested and detained by the federal immigration authorities. After his release from confinement in January 2002, Mr. Malvo rejoined Mr. Muhammad, who dramatically escalated his isolation and indoctrination efforts, including combat training and constant exposure to anti-government thinking.

The forensic psychiatrist concluded that, as a result of Mr. Muhammad's coercive persuasion, Mr. Malvo developed a dissociative disorder: "He was programmed by Muhammad to become adept at inducing trance-like states, lost his sense of identity and became totally dependent on and obedient to his all-knowing father." The forensic psychiatrist concluded that, at the time he committed his crimes, Mr. Malvo was "severely impaired in his ability to distinguish right from wrong and was severely impaired in his ability to resist the impulse to commit the act."

According to the report, as Mr. Malvo awaited trial in Virginia, his defense counsel attempted to detach him from Mr. Muhammad, to whom he initially expressed complete devotion. They put Mr. Malvo in touch with his biological father for the first time in years, as well as an influential teacher and guardian from Mr. Malvo's youth. According to the report, Mr. Malvo improved enough to cooperate with his defense team in his initial trial, but in 2004 he would sometimes revert back into his Muhammad identity.

17

By March 2006, Mr. Malvo decided that he should testify against Mr. Muhammad. Before he had discussed that decision with his defense counsel, he wrote to the prosecution, stating that "I need to do this for myself and for the victims." As noted above, two months later, he voluntarily testified as a key witness at Mr. Muhammad's trial and later pled guilty to all of the charges against him without a plea deal.

4.      Sentencing

Mr. Malvo was sentenced in the Circuit Court on November 8, 2006. At the time of the sentencing, Maryland law required the sentencing court to impose a sentence of life imprisonment for each murder conviction. Maryland Code, Criminal Law Article ("CR"), §2-201(b) (2006).[16] However, the judge had discretion to, among other things, suspend all or part of a sentence, allow or prohibit eligibility for parole, and make a sentence concurrent with or consecutive to other sentences.

The presentence report that had been prepared by the Division of Parole and Probation stated that, under the Maryland sentencing guidelines, Mr. Malvo should receive six consecutive terms of life in prison without the possibility of parole, in light of the fact that his offenses resulted in the deaths of six persons. Relatives of two of the murder victims spoke at the sentencing proceeding. One understandably asked the court to ensure that Mr. Malvo would never re-enter society. The second forgave him for killing her son,

---

[16] At that time, the Maryland statute authorizing imposition of the death penalty for first-degree murder had set a minimum age of 18 for that punishment since 1987 – two decades before the Supreme Court's *Roper* decision. *See* CR §2-202(b)(2)(i) (2006); Chapter 636, Laws of Maryland 1987. The statutory provision authorizing the death penalty for adults has since been repealed as well. Chapter 156, Laws of Maryland 2013.

told Mr. Malvo it would have changed his life if he had known her son, and urged him to make amends with God. Both speakers expressed appreciation to the court system and others.

The State acknowledged that Mr. Malvo "has changed," and had expressed genuine remorse and "grown tremendously," but it also recommended that he receive "the absolute maximum allowable under the law" – six consecutive sentences of life without parole. Referring to Mr. Malvo's testimony against Mr. Muhammad, the prosecutor said "[t]hese acts of contrition … advanced the healing process and the closure process for the victims' families and the entire community…." In the prosecutor's words, Mr. Malvo was a "tragic figure," "under the sway of a truly evil man who infused a 17-year-old with the ideology of hate, an ideology, it appears that Mr. Malvo has now escaped from."

Mr. Malvo's defense counsel requested that the Circuit Court impose life sentences concurrent to one another and concurrent to his existing life sentences in Virginia. His attorneys did not request parole-eligible sentences. After his counsel gave brief remarks, Mr. Malvo expressed his remorse.

The Circuit Court first acknowledged Mr. Malvo's cooperation with law enforcement in the case against Mr. Muhammad and said that Mr. Malvo "should be commended for [his] acceptance of guilt and voluntary assistance without any promise of leniency." The court further stated:

> It appears you've changed since you were first taken into custody in 2002. As a child, you had no one to establish values or foundations for you. After you met John Allen Muhammad and became influenced by him, your chances for a successful life became worse than they already were.

19

You could have been somebody different. You could have been better. What you are, however, is a convicted murderer. You will think about that every day for the rest of your life. You knowingly, willingly, and voluntarily participated in the cowardly murders of innocent, defenseless human beings.

You've shown remorse and you've asked for forgiveness. Forgiveness is between you and your God, and personally, between you and your victims, and the families of your victims. This community, represented by its people and the laws, does not forgive you.

You've been held accountable for the crimes you've committed here. You will receive the maximum sentence allowed by the law of this State.

The Circuit Court then imposed six sentences of life without parole, consecutive to each other and to Mr. Malvo's life sentences in Virginia.

5.      Motion to Correct an Illegal Sentence

More than a decade later, in January 2017, Mr. Malvo filed a motion to correct an illegal sentence under Maryland Rule 4-345(a) in the Circuit Court. The motion was based on the intervening Supreme Court decisions in *Miller* and *Montgomery*. Mr. Malvo's counsel asserted that, under those decisions, a juvenile homicide offender could be sentenced to life in prison without the possibility of parole only if the sentencing judge first determined that the offender was irredeemable. Because that determination had not been made at Mr. Malvo's sentencing, he argued, a new sentencing hearing was required.

The Circuit Court heard argument on the issue and, in August 2017, issued a memorandum opinion denying the request for a new sentencing hearing.[17] The Circuit

---

[17] The judge who had presided at Mr. Malvo's guilty plea and sentencing retired in 2006 shortly after sentencing Mr. Malvo. A different judge conducted the motion hearing and issued the memorandum opinion in 2017.

Court stated that the substantive rule on sentencing made retroactive by *Montgomery* applied only to mandatory life-without-parole sentences and, given that the sentencing judge in Mr. Malvo's case had discretion under Maryland law to sentence him to life *with* the possibility of parole, Mr. Malvo's sentence was not illegal within the meaning of Maryland Rule 4-345(a). Noting that the ruling was likely to be appealed, the court went on to consider whether Mr. Malvo's sentencing complied with the requirements of *Miller*. The court stated that the sentencing judge was presumed to be aware of the Supreme Court decision in *Roper* – the first of the Supreme Court's decisions distinguishing the juvenile and adult sentencing for purposes of the Eighth Amendment and the only one that preceded Mr. Malvo's sentencing. The court also noted that the sentencing judge was presented with mitigating evidence related to Mr. Malvo's youth at the time of sentencing, acknowledged some of it, and presumably took it into account in imposing the sentence. The court concluded that the sentence did not violate the principle set forth in *Miller*.

Mr. Malvo appealed the Circuit Court's ruling. The Court of Special Appeals stayed the appeal pending this Court's decision of several cases that later resulted in the decision in *Carter v. State*, 461 Md. 295 (2018). While that stay was still in effect, Mr. Malvo filed a pre-judgment petition for a writ of *certiorari* in this Court in January 2018. We held that petition pending the Supreme Court's decision in *Jones*. Following the Supreme Court's decision in that case and supplemental filings related to Mr. Malvo's petition, we granted a writ of *certiorari* in August 2021.

## II

## Discussion

### A.    Standard of Review

Under Maryland Rule 4-345(a), a court may correct an illegal sentence at any time. The legality of a sentence is a question of law that an appellate court reviews *de novo*. *Bailey v. State*, 464 Md. 685, 696 (2019). A sentence that constitutes cruel and unusual punishment under the Eighth Amendment or the Maryland Declaration of Rights is an illegal sentence for purposes of Maryland Rule 4-345(a). *Harris v. State*, 479 Md. 84, 113 (2022); *see also Randall Book Corp. v. State*, 316 Md. 315, 322 (1989).

### B.    Whether the Sentencing Complied with the Eighth Amendment

As outlined above, *Miller* and *Montgomery* established that the Eighth Amendment requires a hearing where "youth and its attendant characteristics" are considered as sentencing factors so that life without parole is not imposed in cases where a juvenile offender's crime resulted from transient immaturity. In *Jones*, where the sentencing occurred after *Miller* and *Montgomery*, the Court clarified that a discretionary sentencing system is "both constitutionally necessary and constitutionally sufficient" to satisfy the procedural component established by *Miller* and *Montgomery*. No explicit finding of the offender's incorrigibility is a prerequisite to a sentence of life without parole; instead, a defense presentation of argument about the offender's youth and the exercise of the court's discretion to impose a no-parole sentence can serve as an implicit finding of incorrigibility.

While sentencing Mr. Malvo against a constitutional background that lacked all of *Graham*, *Miller*, *Montgomery*, and *Jones*, the judge appeared to recognize that his crimes

22

– heinous as they were – were committed by a vulnerable and impressionable youth deeply under the sway of an adult he viewed as a father figure. Also, the judge stated that Mr. Malvo had changed in the four years since he had committed those crimes. At the same time, the judge told Mr. Malvo that "[w]hat you are, however, is a convicted murderer." These statements lead to two equally reasonable, though conflicting, inferences as to the sentencing judge's view on whether Mr. Malvo was "the rare juvenile offender whose crime reflects irreparable corruption" and who thus was constitutionally eligible under the subsequent Supreme Court cases for a sentence of life without parole. *Miller*, 567 U.S. at 479-80. A third, and perhaps more likely, inference is that the sentencing judge, who in 2006 had no reason to predict the Supreme Court's development of that standard, did not consider it.

The State argues that resentencing of Mr. Malvo is foreclosed by the Supreme Court's most recent decision in *Jones* and the fact that Maryland has a discretionary sentencing system. Mr. Malvo's sentencing is distinct from that in *Jones*. It is certainly true that Maryland had a discretionary sentencing regime when Mr. Malvo was sentenced in 2006 and, as usual, we presume that a sentencing judge knows the applicable law – that is, the range of the judge's discretion under the extant law. However, the sentencing in *Jones* took place *after Miller* had been issued and was in fact a resentencing following a remand from an appellate court as a result of *Miller*. The sentencing court in *Jones* acknowledged that it had discretion to impose a different sentence in light of *Miller* and explicitly exercised its discretion not to do so. *See Jones*, 141 S. Ct. at 1311, 1313.

23

In contrast, Mr. Malvo was sentenced *before* the decisions in *Miller* and *Montgomery* were issued and the sentencing court was therefore unaware of the Eighth Amendment constraints that those decisions would announce. We presume that a sentencing judge knows and applies the law, but we do not presume that a sentencing judge is clairvoyant.[18] Indeed, in *Jones*, the Supreme Court acknowledged that most offenders

[18] The dissenting opinion of Judge Watts equates Mr. Malvo's sentencing proceeding to that in *Harris v. State*, 479 Md. 84 (2022). As Judge Watts acknowledges, in that case, a juvenile offender was sentenced to life *with* parole and, accordingly, the *substantive* requirement of *Miller* did not apply. However, the Court in *Harris* noted in *dicta* that the sentencing proceeding complied with *Miller*'s *procedural* requirement, as construed in *Jones*. 479 Md. at 118-20. Like the resentencing at issue in *Jones*, the sentencing in *Harris* occurred *after* the Supreme Court had announced the substantive incorrigibility standard in *Miller* and *Montgomery*. We can presume, as we usually do, that the sentencing court applied that existing law. As explained in the text, that is not this case, where the sentencing occurred *before* those decisions.

The dissenting opinion of Judge Hotten likewise merges the procedural and substantive elements of *Miller* and therefore does not recognize that *Jones* "[did] not disturb" the substantive requirement of *Miller* that, as recognized in *Montgomery*, made it retroactive to cases such as this one. *Jones*, 141 S. Ct. at 1317 n.4. Contrary to the suggestion in Judge Hotten's dissent, there is no dispute that *Jones* held that a "separate factual finding" is not required to satisfy the procedural component of *Miller*. Dissent of Judge Hotten at 7-8 n.2. But that does not mean that a sentencing that is completely ignorant of the substantive standard set by *Miller* – i.e., one that preceded its announcement – necessarily complies with the Eighth Amendment. Indeed, if the mere existence of a discretionary sentencing regime that could take a defendant's youth into account alone is sufficient to satisfy *Miller*, there would have been no reason for the Supreme Court to vacate life-without-parole sentences imposed prior to *Miller* and *Montgomery* under discretionary sentencing regimes and remand those cases for resentencing in light of those cases. But that is what the Court did. *See, e.g., Tatum v. Arizona*, 137 S. Ct. 11 (2016); *Purcell v. Arizona*, 137 S. Ct. 369 (2016); *Najar v. Arizona*, 137 S. Ct. 369 (2016); *Arias v. Arizona*, 137 S. Ct. 370 (2016); *DeShaw v. Arizona*, 137 S. Ct. 370 (mem.) (2016); *Blackwell v. California*, 568 U.S. 1081 (2013); *Mauricio v. California*, 568 U.S. 975 (2012); *Guillen v. California,* 567 U.S. 950 (2012). As noted in the text, in referring to juvenile offenders like Mr. Malvo, for whom *Miller* and *Montgomery* applied retroactively,

to whom *Miller* and *Montgomery* applied retroactively had already been resentenced. *Jones*, 141 S. Ct. at 1317 n.4. ("By now, most offenders who could seek collateral review as a result of *Montgomery* have done so and, if eligible, have received new discretionary sentences under *Miller*.").

The State argues that the sentencing judge in Mr. Malvo's case would be presumed to be aware of the *Roper* decision – the first of the series of Supreme Court decisions on Eighth Amendment constraints on the sentencing of juvenile offenders, which prohibited imposition of the death penalty. No doubt the sentencing court was well aware that the death penalty was off the table in Mr. Malvo's case under the relevant Maryland statute, as it had been for almost two decades.[19] And the court may well have been familiar with the *Roper* decision's interpretation of the Eighth Amendment. But it would be quite another thing for a sentencing court to extrapolate from that case, forecast the future holdings of *Miller* and *Montgomery*, and then silently apply that foresight in a sentencing proceeding.[20]

In our view, the legality of a sentence under the Eighth Amendment is not a topic for this Court's speculation. Here, it is unclear at best whether Mr. Malvo's sentencing proceeding complied with the Eighth Amendment constraint announced in *Miller*, made

---

the Supreme Court observed in *Jones* that "[b]y now, most offenders … have received new discretionary sentences under *Miller*." 141 S. Ct. at 1317 n.4.

[19] *See* footnote 16 above.

[20] Notably, the trial and appellate courts in Arkansas, Alabama, and Louisiana, which issued the decisions reversed in *Miller* and *Montgomery*, also had the benefit of the *Roper* decision at the time they issued the decisions that were later overturned by the Supreme Court.

25

retroactive in *Montgomery*, and affirmed in *Jones*. Accordingly, we shall remand to the Circuit Court for resentencing.[21]

---

[21] Mr. Malvo's flagship argument is based on the Eighth Amendment and the recent Supreme Court decisions construing it. Alternatively, he argues that his sentence was illegal under Article 25 of the Maryland Declaration of Rights, which prohibits the imposition of "cruel *or* unusual punishment." (emphasis added). This Court has generally construed the language of Article 25, which pre-dates the Eighth Amendment, consistently with the Supreme Court's construction of the Eighth Amendment, although the Court has noted that the textual difference in the two provisions may in some circumstances support a broader interpretation of Article 25. *Thomas v. State*, 333 Md. 84, 103 n.5 (1993).

State supreme courts that have construed similarly-worded state constitutional provisions to provide additional protections have noted a grammatical basis for doing so. *See, e.g.*, *People v. Bullock*, 485 N.W.2d 866, 872 n.11 (Mich. 1992) (observing that "it seems self-evident that any adjectival phrase in the form 'A *or* B' necessarily encompasses a broader sweep than a phrase in the form 'A *and* B.' The set of punishments which are either 'cruel' *or* 'unusual' would seem necessarily broader than the set of punishments which are both 'cruel' *and* 'unusual.'"); *see also* Dan Friedman, *Tracing the Lineage: Textual and Conceptual Similarities in the Revolutionary-Era State Declarations of Rights of Virginia, Maryland, and Delaware*, 33 Rutgers L.J. 929, 967 (2002) (articulating similar reasoning with respect to Article 25); *cf.* Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law (2018) at pp. 92-96 (describing early decision striking down forced sterilization sentence under "cruel or unusual" provision of a state constitution).

Some state supreme courts have held that such language bars the imposition of a sentence of life without the possibility of parole for a juvenile offender. *See, e.g., Bullock, supra*; *Diatchenko v. District Attorney for Suffolk District*, 1 N.E.3d 270 (Mass. 2013); *see also State v. Kelliher*, 873 S.E.2d 366, 382-387 (N.C. 2022) (holding that the ban on "cruel or unusual" punishments in the North Carolina constitution prohibits the imposition of a juvenile life-without-parole sentence "unless the trial court expressly finds that a juvenile homicide offender is one of those 'exceedingly rare' juveniles who cannot be rehabilitated"); *State v. Bassett*, 428 P.3d 343, 349-350 (Wash. 2018) (holding that a Washington constitutional provision prohibiting "cruel" punishment categorically bars life-without-parole sentences for juvenile offenders).

## C. Whether JUVRA Renders a Resentencing Unnecessary

The State argues that, regardless of whether Mr. Malvo's life-without-parole sentences violate the Eighth Amendment, the possibility of a sentence reduction under JUVRA cures any constitutional deficiency. Thus, in the State's view, Mr. Malvo's sentences are each effectively life with the possibility of parole – at least as far as the Eighth Amendment is concerned.

In many instances in which a juvenile offender is serving a lengthy sentence, the State's argument is likely to be correct. As this Court has noted, "[t]here is no constitutional requirement that a state have a parole system *per se*, so long as the state provides a meaningful opportunity for release based on demonstrated maturity and rehabilitation." *Carter*, 461 Md. at 318.[22] Both JUVRA and the parole regulations require that a court and the Parole Commission, respectively, consider the individual's youth at the time of the offense(s) and assess the offender's subsequent maturity and rehabilitation. *Compare* CP §8-110 (JUVRA review criteria) *with* COMAR 12.08.01.18 (considerations for parole).

As noted above, JUVRA provides that a court may reduce the duration of a juvenile offender's sentence if the court finds that (1) the individual is not a danger to the public;

---

As we are holding that the Eighth Amendment requires that Mr. Malvo be resentenced, we need not decide whether Article 25 would require that relief even if the Eighth Amendment did not.

[22] In *Carter*, the Court concluded that the Maryland parole system provided the requisite opportunity for release for Eighth Amendment purposes. 461 Md. at 365. *Carter* pre-dated the passage of JUVRA.

27

and (2) the interests of justice will be better served by a reduced sentence. CP §8-110(c). Of the 10 statutory factors that a reviewing court must consider, most direct the court to consider the offender's youth at the time of the offense and the offender's subsequent progress while incarcerated. These include "whether the individual has substantially complied with the rules of the institution," "whether the individual had completed an educational, vocational, or other program," "whether the individual has demonstrated maturity, rehabilitation, and fitness to reenter society sufficient to justify a sentence reduction," and "the diminished culpability of a juvenile as compared to an adult…." CP §8-110(d). The court must issue a written decision that addresses these factors. CP §8-110(e).

If anything, review of a sentence under JUVRA may provide a better opportunity than the parole process for many offenders to secure release or a sentence reduction. Unlike parole hearings, which are described by the regulations as "interview[s]" where "formal presentations by attorneys, relatives, and others interested are not permitted," COMAR 12.08.01.18C,[23] a juvenile offender who files a motion under JUVRA is entitled to a court hearing at which the offender may introduce evidence in support of the motion. CP §8-110(b). Thus, as a general rule, JUVRA is likely to provide the "meaningful opportunity for release" contemplated by the Supreme Court.

But it is not clear that JUVRA alone would cure an illegal sentence and provide a meaningful opportunity for release equivalent to parole for a defendant serving multiple

---

[23] *See Farmer v. State*, 481 Md. 203, 210-14 (2022), op. at 2-8, for a more detailed description of the parole standards and process.

consecutive life-without-parole sentences. Assuming that the individual's sentences are illegal for failure to comply with *Miller* and the defendant is entitled to be resentenced, JUVRA might not be an adequate substitute for the imposition of legal sentences. There are many variables at play: whether on resentencing, the sentencing court, newly mindful of the Eighth Amendment constraints, determines that the defendant is incorrigible; if not, how the defendant is resentenced (whether the sentences are appropriately consecutive or concurrent and how they are aggregated[24]); and how JUVRA is construed to apply to them.[25]

In Mr. Malvo's case, this may be an entirely academic question. His Maryland life-without-parole sentences run consecutively to each other and to the Virginia sentences that he is currently serving.[26] The first step – a sentencing compliant with the Eighth Amendment – has not yet happened. At this time, we cannot say that JUVRA alone renders his sentence compliant with the Eighth Amendment as construed in *Miller*.

---

[24] That determination can also affect a defendant's timeline for parole eligibility.

[25] As noted in *Farmer*, 481 Md. at 230-31, op. at 26, there are several open questions concerning the application of JUVRA. The answers to those questions may determine the extent to which the statute functions as a meaningful opportunity for release equivalent to parole for a juvenile offender serving multiple consecutive life-without-parole sentences.

[26] Under a law enacted in 2020, all juvenile offenders in Virginia are now eligible for parole after serving 20 years. Va. Code §53.1-165.1(E). Of course, that law does not mean that Mr. Malvo will be paroled in Virginia when he becomes eligible – or ever.

29

# III

## Conclusion

To comply with the standard that the Supreme Court has set for sentencing a juvenile offender to life without parole, the Circuit Court must resentence Mr. Malvo. We express no opinion on what sentence the Circuit Court should impose.[27] As in any criminal case, the sentencing court has broad discretion and there will be no question in this instance that the sentencing court is aware of the relevant Eighth Amendment constraints.

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EVENLY BETWEEN PETITIONER AND MONTGOMERY COUNTY.**

---

[27] Judge Hotten's dissent concludes that the offenses committed by Mr. Malvo were not the product of transient immaturity and that the six consecutive life-without-parole sentences are "just, fair, and compliant with the Eighth Amendment." Although the Supreme Court standard still permits a sentencing court to sentence a juvenile homicide offender to life without parole, she asserts that the General Assembly's policy choice in the prospective provision of JUVRA will eliminate that option on remand. Dissent of Judge Hotten at 22 n.8. That may well be true, but as horrible as we may find these crimes, it is not our role to advocate for any particular sentence or to make the decision for the sentencing court. Rather, it is to ensure that sentences are imposed in compliance with the Eighth Amendment as interpreted by the Supreme Court.

# Appendix A

At Mr. Malvo's guilty plea proceeding on October 10, 2006, in the Circuit Court for Montgomery County, the Assistant State's Attorney prosecuting the case gave the following statement of facts as the basis for the charges to which Mr. Malvo was pleading guilty. Mr. Malvo indicated that he agreed with the statement to the extent it covered the incidents in Maryland to which he was pleading guilty. His attorney indicated that he would not admit guilt to offenses in other jurisdictions pending a global disposition of other charges.

Had the case gone to trial, the evidence would have shown that these six murders occurred on three separate days in October of 2002. These victims were James Martin who was killed on October 2nd, James Buchanan who was killed on October 3rd, Premkumar Walekar also killed on October 3rd, Maria Sarah Ramos killed on October 3rd, Lori Ann Lewis-Rivera killed on October 3rd and finally Conrad Johnson who was murdered on October 22nd.

These six murders were part of a larger robbery, extortion and killing spree that spanned from September the 5th of 2002 to October the 24th of 2002 in which six other victims were murdered and six more victims suffered gunshot wounds as a result of the defendant's actions. These other shootings occurred elsewhere in Maryland, Virginia, Washington, D.C., Alabama and Louisiana.

The evidence would have shown that on October the 2nd, 2002 at approximately 6:02 p.m. in the parking lot of a Shoppers Food Warehouse located on Randolph Road, Wheaton, Montgomery County, Maryland, James Martin was walking toward the store when he was shot once in the back with a bullet fired from a distance. Mr. Martin said help me and fell to the ground almost immediately dead. There were no eyewitnesses and no meaningful ballistics evidence recovered.

1

However the autopsy revealed that the entry wound to Mr. Martin's back was very small, the exit wound to his chest was very large and there were massive internal injuries, all of which are characteristic of and consistent with a small caliber bullet fired from a high-velocity rifle. The following day, the first of four murders that would occur within about two hours of each other took place; the first of four murders took place at 7:41 a.m. at the Fitzgerald Auto Mall in Rockville, Montgomery County, Maryland.

The victim, James Sonny Buchanan was mowing the lawn on the outer perimeter of the property when he was shot once in the back with a bullet fired from a distance. Mr. Buchanan, clutching his chest, ran on to the parking lot of the dealership, collapsed and later died. Once again there were no eyewitnesses and no meaningful ballistics evidence.

As with Mr. Martin, however, the autopsy revealed that the entry wound to Mr. Buchanan's back was very small, the exit wound to his chest was very large, there were massive internal injuries and the bullet had fragmented into many small pieces, the so-called snowstorm effect, all of which are characteristic of and consistent with a small caliber bullet fired from a high-velocity rifle.

Thirty minutes later at approximately 8:12 a.m. Premkumar Walekar was fueling his taxi cab at the Mobile Gas Station on Connecticut Avenue in Silver Spring, Montgomery County, Maryland when he was shot once with a bullet that was fired from a distance. Mr. Walekar staggered to a nearby car asking for assistance; however, he died within minutes. The autopsy revealed that the bullet had entered under his left arm.

It also showed a small entrance wound, massive internal injuries and the snowstorm effect characteristic of and consistent with a small caliber

bullet fired from a high-velocity rifle. Ballistics tests later established that the bullet fragments recovered from Mr. Walekar's body had been fired from the .223 caliber Bushmaster rifle that was found in the car with the defendant and his co-defendant when they were arrested 21 days later in Frederick, Maryland.

At approximately 8:37 a.m. again on October 3rd, 2002, Maria Sarah Ramos was sitting on a bench in front of the Crisp & Juicy Restaurant in the Leisure World Shopping Center in Silver Spring, Montgomery County, Maryland. She was shot once in the head with a bullet that was fired from a distance and she died instantly. The autopsy revealed that the bullet had entered the front of her head and exited the back. The entrance wound was small, the exit wound was large and the internal injuries massive characteristic of once again and consistent with a small-caliber bullet fired from a high-velocity rifle.

Ballistics tests later established that the bullet fragments recovered from Ms. Ramos' body and a copper bullet jacket recovered from inside the restaurant had been fired from the .223 caliber Bushmaster rifle found in the car with Mr. Malvo and his co-defendant when they were arrested.

Again on October the 3rd at approximately 9:58 a.m. Lori Ann Lewis-Rivera was vacuuming her minivan at the Shell Station at the corner of Connecticut Avenue and Knowles Avenue in Kensington, Montgomery County, Maryland when she was shot once in the back with a bullet that was fired from a distance. The entrance wound was very small, there was no exit wound, the internal injuries were massive and the bullet once again had fragmented with a snowstorm effect characteristic of and consistent with a small caliber bullet fired from a high-velocity rifle.

3

Ballistics tests later established that the bullet fragments recovered from Ms. Lewis-Rivera's body had been fired from the .223 caliber Bushmaster rifle that was found in the car with the defendant and his co-defendant when they were arrested. Thereafter between October the 3rd, 2002 and October the 19th, 2002, four additional victims were murdered and three others seriously wounded in shootings that occurred in the District of Columbia, Virginia and elsewhere in Maryland and I'll outline those shootings in a moment.

The final murder and the sixth that occurred in Montgomery County took place on October the 22nd, 2002 at about 6:00 a.m. While onboard his Ride On bus in the area of Grand Pre Road in Silver Spring, Montgomery County, Maryland, the driver, Conrad Johnson was shot once in the upper abdomen with a bullet that was fired from a distance. Mr. Johnson was taken by helicopter to the hospital where he later died during surgery.

The autopsy revealed that the entrance wound was very small, there was no exit wound, the internal injuries were massive and the bullet had fragmented with a snowstorm effect characteristic of and consistent with a small-caliber bullet fired from a high-velocity rifle. And once again ballistics tests later established that the bullet fragments recovered from his body had been fired from the .223 Bushmaster that was recovered in the defendant's possession at the time of his arrest.

In a patch of woods near the scene of Mr. Johnson's murder, investigators found tacked to a tree a clear plastic Ziploc bag that contained a note. Fifty feet beyond the location of the note, investigators located a black duffle bag, a left-handed glove and a second Ziploc bag. The note which exhibited 13 small adhesive stars believed to represent the 13 victims stated in part "for you Mr. Police, call me God, do not release to the press. You did

4

not respond to the message, you departed from what we told you to say and you departed from the time. Your incompetence has cost you another life. You have until 9:00 a.m. to deliver the money and 8:00 a.m. deliver this response. We've caught the sniper like a duck in a noose knot to let us know you have your demands."

Thereafter in the early morning hours of October the 24th, 2002 at a rest area in Frederick, Maryland, Mr. Malvo and John Allen Muhammad were arrested while sleeping in a blue 1990 Chevrolet Caprice owned by Mr. Muhammad.

Inside the car, investigators recovered numerous evidentiary items including a loaded .223 caliber Bushmaster rifle that yielded Mr. Malvo's DNA and fingerprint, a black duffle bag containing an ammo magazine that yielded Mr. Malvo's DNA and a rifle sight with Muhammad's DNA, a global positioning system receiver, earplugs, maps and Ziploc plastic page, a pair of walkie-talkies, a digital voice recorder with Mr. Malvo and Mr. Muhammad's voices recorded, receipts from Save-A-Lot and Piggly Wiggly stores located in Baton Rouge, Louisiana, and a plastic bag from the Big Lots store, a slip of paper containing the Sniper taskforce hotline telephone number and a Sony laptop computer loaded with the software program Microsoft Streets and Trips 2002.

In this program were many maps of the Washington, D.C., area including one marked with several skull and crossbones icons at locations where various shootings had occurred including the shootings of Mr. Martin and Mr. Buchanan. Additionally, the computer's hard drive included a Microsoft Word file that contained excerpts of an extortion demand. Finally, investigators discovered that the trunk of the Caprice had been fashioned into a sniper's nest. The rear seat was hinged to provide easy access to the trunk,

the inside of the trunk was spray-painted blue to blend in with the color of the exterior and a hole had been cut into the trunk frame just above the license plate, a hole large enough to accommodate the muzzle of a rifle.

In perpetrating the six charged murders, Mr. Malvo and his co-defendant were attempting to extort $10 million from the government. This extortion campaign was preceded by a series of murder/robberies through which the defendants generated the means and tools with which to carry out this campaign. The first of these occurred on September the 5th, 2002 in Clinton, Maryland, where Paul LaRuffa was shot and robbed outside of Margellina's Restaurant which he owned. Mr. LaRuffa was shot five times with a .22 caliber revolver. His Sony laptop and a briefcase containing bank deposit bags and $3,500 in cash were stolen.

The Sony laptop is the one that was found in the Chevy Caprice with the defendant at the time of his arrest. Additionally, about six weeks after the robbery, the briefcase and empty bank deposit bags were found along with some clothing about a mile from the LaRuffa shooting and this clothing yielded Mr. Malvo's DNA. Ten days later on September the 15th, 2002, also in Clinton, Maryland, Muhammad Rashid was shot while closing the Three Roads Liquor Store. He was shot at close range with a .22 caliber revolver by a young man he later identified as Mr. Malvo. Additionally, evidence of two high-velocity rifle shots was recovered from inside the store.

On September the 1st , 2002, Claudine Parker and Kellie Adams were shot immediately after closing the Zelda Road ABC Liquor Store in Montgomery, Alabama. Mrs. Parker died from a single gunshot wound that entered her back. Ms. Adams was shot through her neck but survived. Both bullets came from a high-velocity rifle. Simultaneous with the shootings, a young man later identified as Mr. Malvo ran up to the victims and began to

6

go through their purses. Mr. Malvo was pursued from the scene by a police officer and another bystander. During the chase, he dropped a gun catalog and a .22 caliber revolver.

The catalog yielded Mr. Malvo's fingerprints. Ballistics tests later confirmed that the revolver that he dropped was the same gun used earlier to shoot Mr. LaRuffa and Mr. Rashid in the shootings that I just described. In addition ballistics tests later established that both women, Ms. Parker and Ms. Adams had been shot with the .223 caliber Bushmaster rifle recovered from the car at the time of the defendant's arrest.

Finally, two days later on September the 23rd, 2002 in Baton Rouge, Louisiana, Hong Em Ballenger was murdered outside of a Beauty Depot store. She was shot once in the neck with a bullet fired from a high-velocity rifle. Bullet fragments recovered from her body were later established to have been fired from the Bushmaster rifle recovered with the defendant at the time of his arrest. Additionally two eyewitnesses saw Mr. Malvo flee the scene with Ms. Ballenger's purse and one of them saw him get into the Chevy Caprice.

Now, as previously mentioned, Mr. Malvo and Mr. Muhammad began their extortion scheme with the murders of Mr. Martin, Mr. Buchanan, Ms. Ramos and Ms. Lewis-Rivera on October the 2nd and 3rd in Montgomery County. At approximately 9:15 p.m. later that day on October the 3rd, 2002, Pascal Charlot was shot once in the upper chest as he crossed Georgia Avenue Northwest in Washington, D.C. The bullet was fired from a distance from a high-velocity rifle. Bullet fragments recovered from his body were found to have been fired from the .223 caliber Bushmaster rifle. In addition eyewitnesses placed the Caprice at the scene of the shooting.

7

The next day, October the 4th, 2002, outside of Michael's craft store in Fredericksburg, Virginia, Caroline Seawell was wounded by a single shot from a high-velocity rifle. An eyewitness saw the Caprice in the parking lot at the time of the shooting. Once again ballistics tests established that Ms. Seawell had been shot with a bullet fired from the .223 Bushmaster rifle.

Three days later on October the 7th, 2002, outside of Benjamin Tasker Middle School in Bowie, Maryland, l3-year-old Iran Brown was shot once in the chest from a distance with a high-velocity rifle. An eyewitness saw the Caprice in the neighborhood in the night before the shooting. In the woods next to the school investigators found a ballpoint pen barrel, a shell casing and a Tarot, the death card with handwriting on it. The shell casing and bullet fragments recovered from Iran Brown's body were matched to the .223 caliber Bushmaster rifle. In addition, Muhammad's DNA was found on the pen barrel.

The recovered death Tarot card contained the first communication from the defendants. Written on it was "for you Mr. Police, code call me God, do not release to the press."

These words later appeared repeatedly in the written and oral communications received from the defendants during their extortion campaign. Two days later on October the 9th, 2002 at a Sunoco gas station in Manassas, Virginia, Dean Meyers was fatally shot in the head by a single bullet fired from a high-velocity rifle later established by ballistics tests to have been fired from the .223 Bushmaster rifle.

In addition, two eyewitnesses saw Muhammad in the Caprice in the immediate vicinity of the shooting immediately before and after the fatal shooting of Dean Meyers. Finally, a map recovered from the area where the shot had been fired contained both defendants Mr. Malvo's and Mr.

8

Muhammad's fingerprints. On October the 11th, 2002, at an Exxon gas station in Massaponax, Virginia, Kenneth Bridges was fatally shot by a single bullet to the back fired from a high-velocity rifle later established by ballistics tests to have been the .223 Bushmaster rifle. An eyewitness saw the Caprice near the gas station on the morning of the shooting.

On October the 14th, 2002 at a Home Depot store in Fairfax, Virginia, Linda Franklin was fatally shot in the head by a single bullet fired from a high-velocity rifle once again later established by ballistics tests to be the .223 Bushmaster rifle. Finally, on October the 19th, 2002, outside a Ponderosa Steakhouse in Ashland, Virginia, the second to last shooting occurred. Jeffrey Hopper and his wife were walking to their car after dinner when Jeffrey Hopper who survived was shot once in the abdomen with a bullet fired from a high-velocity rifle. Near the scene of the shooting police recovered a shell casing, a cinna-raisin (phonetic sp.) candy wrapper and a Ziploc bag containing a note.

The shell casing and bullet fragments recovered from Mr. Hopper's body were established to have been fired from the .223 Bushmaster rifle. The cinna-raisin wrapper and the Ziploc bag contained Mr. Malvo's DNA. The note found near the scene had five adhesive stars attached to it which the defendants claimed of communications to be the lives lost because of police incompetence. The note also read in part "for you Mr. Police, call me God, do not release to the press, we've tried to contact you to start negotiation. These people took our call for a hoax or a joke so your failure to respond has cost you five lives.

If stopping the killing is more important than catching us now then you will accept our demand which are non-negotiable. One you will place $10 million in Bank of America account number, and the account number's

listed, we will have unlimited withdrawal at any ATM worldwide. You will activate the bank account, credit card and pin number. We will contact you Ponderosa Buffet, Ashland, Virginia, telephone number and the number is provided, 6:00 a.m. Sunday morning. You have until 9:00 a.m. Monday morning to complete transaction. Try to catch us withdrawing at least you will have less body bags.

Two, if trying to catch us now more important that prepare your body bags. If we give you our word that is what takes place. Word is bond. P.S.. your children are not safe anywhere at any time.

The last shooting, Conrad Johnson's murder, took place three days later on October the 22nd. Two days later as I've described the defendants were arrested in the Chevy Caprice with the evidence that I previously described.

After Mr. Malvo's arrest and following his transfer to Fairfax County, Virginia, Mr. Malvo spoke to investigators at length. At that time he claimed to be the shooter in each of the October 2002 crimes. He had been instructed to accept responsibility for the shootings by Muhammad who told Mr. Malvo that as a juvenile he would be less likely to get the death penalty. Subsequently however as outlined in his testimony at the trial of John Allen Muhammad, Mr. Malvo described the origins and the motive for the scheme that had been made up by Mr. Muhammad.

He described how he and Muhammad came to Montgomery County where they drove around scouting areas that would be good places to shoot. According to Mr. Malvo they looked for and targeted locations that did not have surveillance cameras and would be easy to leave without detection. At times they abandoned previously selected sights because of too many witnesses or too much traffic. Mr. Malvo also testified that in all but three

10

of the shootings he acted as the spotter, sitting in the front passenger seat of the Caprice while Muhammad went into the trunk where he fired the .223 Bushmaster rifle at the victims.

In three of the shootings, Mr. Malvo fired the shots from outside the car while he remained in communication with Muhammad. These were the non-fatal shootings of Iran Brown and Jeffrey Hopper and the murder of Conrad Johnson.

# Appendix B

# Neil Blumberg, M.D., P.A.

Diplomate, American Board of Psychiatry and Neurology
Diplomate, American Board of Forensic Psychiatry
Fellow, American Psychiatric Association

30 East Padonia Road
Suite 206
Timonium, Maryland 21093
Telephone: 410-561-1156
Fax: 410-683-0332
e-mail:neilblumbergmd@aol.com

4550 Montgomery Avenue
Suite 733 North
Bethesda, Maryland 20814
Telephone: 301-656-6452

October 15, 2003

Michael S. Arif, Esquire
Craig S. Cooley, Esquire
Law Offices of Martin, Arif, Petrovich
  and Walsh
Suite 105
8001 Braddock Road
Springfield, Virginia  22151

Re: Commonwealth v. Lee Boyd Malvo

Dear Messrs. Arif and Cooley:

Pursuant to your request, I have completed my forensic psychiatric evaluation of Lee Malvo, an eighteen year old, young man from Jamaica, who is charged with the Capital Murder (two counts) of Linda Franklin and Using A Firearm In The Commission of a Felony in an offense that occurred in Fairfax County, Virginia on October 14, 2002. The purpose of this evaluation was to determine if, at the time of the offense, as a result of a mental disease or defect, the defendant was legally insane.

In order to address the above issues, I reviewed numerous materials provided to me by your office, including, but not limited to, the following:

1. Discovery materials provided by Fairfax County, Virginia;
2. Discovery materials provided by Prince William County, Virginia;
3. Discovery materials provided by the F.B.I.;
4. Discovery materials provided by Montgomery County, Maryland;
5. Discovery materials provided by the Bellingham, Washington Police Department;
6. Videotapes and transcripts of the defendant's statements to the Fairfax County police and the substance of oral statements;
7. Oral statements and transcripts of testimony of Captain Joseph Stracke and Corporal Wayne Davis;
8. Videotapes of interviews of John Muhammad by the Montgomery County and Prince William County police;
9. Immigration file of Una James;
10. Harborview Medical Center records of Una James;

To: Michael S. Arif, Esquire
Craig S. Cooley, Esquire
Re: Commonwealth v. Lee Boyd Malvo

11. Defendant's school records from York Castle High School and Spalding Comprehensive High School;

12. Defense investigator/mitigation specialist written and/or videotaped interviews with the following:

A. Earl Dancy;
B. Chris Marley;
C. Sylvia Sillas;
D. James Mitton;
E. James Fritzinger;
F. Rory Reublin;
G. Jerry Page;
H. Albert Archer;
I. Leslie Malvo;
J. Mrs. Reid;
K. Epsy James;
L. John Lawrence;
M. Marvin Blake;
N. Theodore Williams;
O. Leonie Martin;
P. Alissa Marez;
Q. Nathan Perry;
R. Jerome Braswell;
S. Mary Marez;
T. Peter David;
U. Ronald Todd;
V. Allan LaRowe;
W. Don Hoaland;
X. Lloyd Barrett;
Y. O'Neil Grove;
Z. Mr. Smith;
AA. Lula Bradshaw;
BB. Ena Crawford;
CC. Menda Gibbs;
DD. Marie Lawrence;
EE. Beverly Jack-Spence;
FF. Dorothy Livingston;
GG. Mrs. Nelson;
HH. Beverly Clark;
II. John Lawrence;
JJ. Carlena Powell;

To:     Michael S. Arif, Esquire
        Craig S. Cooley, Esquire
Re:     Commonwealth v. Lee Boyd Malvo

      KK.     Dwayne Perry;
      LL.     Onykeya Nevins;
      MM.     Mellisha Coke;
      NN.     Andrew McCloud;
      OO.     Mrs. McCloud;
      PP.     Mr. Johnson;
      QQ.     Martha Robinson;
      RR.     Marie Robinson;
      SS.     Althea Wilson;
      TT.     Webster Maxwell;
      UU.     Winsome Maxwell;
      VV.     Ms. Maxwell (Webster Maxwell's wife);
      WW.     Rudolph Miller;
      XX.     John Sewsanker; and,
      YY.     Cheryl Morris;
13.     Dateline interviews with Simone Powell and Una James; and,
14.     Larry King interview with the Williams family.

I examined Lee Malvo at the Fairfax County Detention Center on twenty occasions between November 25, 2002 and October 14, 2003. I have reviewed the psychological test findings of Dewey Cornell, Ph.D. and David Schretlen, Ph.D. I have also conducted telephone interviews with the following individuals:

1.     Una James;
2.     Robert Holmes;
3.     Lloyd Barrett;
4.     Mrs. Esmie McCloud;
5.     Leslie Malvo;
6.     Steve Clark;
7.     Reverend Albert Archer;
8.     John Mills;
9.     Jerry Page;
10.    Winsome Maxwell; and
11.    Simone Powell.

To:   Michael S. Arif, Esquire
      Craig S. Cooley, Esquire
Re:   Commonwealth v. Lee Boyd Malvo

As a result of my forensic psychiatric evaluation, it is my opinion, to a reasonable degree of medical certainty, that on October 14, 2002, Lee Malvo was suffering from the following mental diseases:

1.   Dissociative Disorder Not Otherwise Specified (DSM-IV-TR: 300.15);
2.   Depressive Disorder Not Otherwise Specified (DSM-IV-TR: 311); and,
3.   Conduct Disorder, Childhood Onset (DSM-IV-TR: 312.81).

It is my further opinion, to a reasonable degree of medical certainty, that on October 14, 2002, as a result of the above-noted mental diseases, Lee Malvo was severely impaired in his ability to distinguish right from wrong and was severely impaired in his ability to resist the impulse to commit the act.

Lee Malvo was born in Kingston, Jamaica on February 18, 1985, the only child of Una James and Leslie Malvo. He was described as a happy child until his mother separated from his father when Lee was five. Lee infrequently saw his father, who had been a loving and nurturing figure in his life, and was later mistreated by his mother's boyfriend. However, the most severe disruption in his young life occurred at the age of nine, when Una James placed him, for the first time, in the extended care of another person, while she sought employment on different islands. Lee had several different placements, some for over one year at a time, during which he was periodically neglected and physically and emotionally abused. He felt abandoned by his mother, as well as his father. He became clinically depressed (leading to my diagnosis of Depressive Disorder Not Otherwise Specified) as a result of the parental abandonments, frequent uprootings, changes in schools (he attended at least ten different schools), and abuse and neglect and at times threatened suicide. At times, he acted-out his anger and frustration in response to these traumas (leading to my diagnosis of Conduct Disorder, Childhood Onset). He learned to cope with these traumas by putting himself in trance-like states (i.e., dissociating) in order to psychologically remove himself from overwhelming pain and despair. Others noted his distress over his separations from his mother but described him as a bright, well-behaved, loving and obedient child, who was desperately searching for a stable, loving and nurturing parent.

Lee first met John Muhammad in October, 2000, when he was fifteen years old and living in Antigua. Lee had moved to Antigua with his mother in late 1999, although she left him alone to work in St. Maarten from March until August, 2000. Lee saw Muhammad playing on a flight simu-lator with his son and was immediately impressed by the care and attention he lavished on his child. Other children, including Lee, were drawn to Muhammad, who began teaching the children basic martial arts and buying them treats. Lee formally met Muhammad in November, 2000 when his mother purchased documents from Muhammad to attain her dream of coming to the United States. He witnessed Muhammad's relationship with his three children and viewed Muhammad as the ideal father. In December, 2000, after his mother abandoned him again to move to the United States, Lee

To:    Michael S. Arif, Esquire
       Craig S. Cooley, Esquire
Re:    Commonwealth v. Lee Boyd Malvo

moved in with Muhammad and his family and found the loving, caring and reliable parent that he never had and so desperately wanted.

Lee lived with Muhammad in Antigua from December, 2000 until coming to the United States in May, 2001, to ultimately reunite with his mother. During this time, Lee and Muhammad's father-son bond was cemented. Lee was the obedient oldest child who took care of his younger siblings. He converted to Islam, adopted Muhammad's American accent, began studying Muhammad's view of the plight of the Black man in America, lost interest in school, began rigorous physical training and began assisting Muhammad in his illegal activities. He viewed Muhammad as his father and teacher as he became Muhammad's obedient son.

Lee moved to Florida with Muhammad and his family in May, 2001 and shortly thereafter joined his mother in Fort Myers, Florida. Although deeply attached to Muhammad and his family, Lee's dream was to reunite with his mother, become a United States citizen, go to college and become a pilot and a productive member of society. He began Cypress Lake High School and was on his way to fulfilling his dream when he learned that in order to take the college entrance examinations, he would have to have a Social Security Number. He realized that in order to go to college, he would have to be a legal resident. He became distraught. His mother insisted that he get a high school diploma but forbid him from considering the military or any other route by which he could reach his dream. He continued to maintain telephone contact with Muhammad and decided that the easiest way to become a citizen was to be adopted. Muhammad, who had lost custody of his children, supported this plan. Lee's mother strongly objected, but blocked other paths to his becoming a legal resident. Lee left Florida in October, 2001 to join Muhammad in Washington State. Lee again saw his mother as failing him as a parent, while Muhammad was willing to take him in as his adopted son.

Lee arrived in Bellingham, Washington in October, 2001. He enrolled at Bellingham High School, lived with Muhammad at the Lighthouse Mission and began an intense relationship with Muhammad that Lee believed would ultimately result in his becoming a legal citizen, going to college and becoming a pilot. Muhammad introduced Lee as his son and after school they spent all of their time together. Muhammad began a rigorous program of physical conditioning, weapons and tactical training, honing various theft activities, as well as religious and political indoctrination focusing on the oppression of the Black man in America. Witnesses described Lee as a well-behaved and obedient son. Lee was ecstatic at uniting with the father who would help him reach his dream. He still planned to reunite with his mother after becoming a success in the United States.

Lee's plans for a successful future in America were dashed when his mother came to Washington State to reclaim him from Muhammad. In December, 2001, both Lee and his mother were arrested and detained by the I.N.S. as a result of their illegal status. Lee realized that his mother again ruined any chance he had of legally fulfilling his dream in America. The only person

To:   Michael S. Arif, Esquire
      Craig S. Cooley, Esquire
Re:   Commonwealth v. Lee Boyd Malvo

who truly cared for him was Muhammad. Shortly after his release from confinement in January, 2002, Lee left his mother to join Muhammad.

Although the development of dissociative symptoms in response to the process of prolonged and intense coercive persuasion (i.e., Dissociative Disorder Not Otherwise Specified) had begun in earnest when Lee arrived in Washington State in October, 2001, the intensity of that indoctrination dramatically escalated by January, 2002. Lee utilized dissociative defenses to cope with overwhelming feelings of depression during his childhood. He was programmed by Muhammad to become adept at inducing trance-like states, lost his sense of identity and became totally dependent on and obedient to his all-knowing father. Muhammad dominated every aspect of Lee's life. He determined when, what and where he ate, how long and where he slept and what he did. Muhammad isolated Lee from others. Every activity involved a lesson. Muhammad escalated the indoctrination process with further weapons and martial arts training, physical conditioning and political indoctrination that involved extensive reading, discussion and even listening to recordings of Farrakhan, Malcolm X and selected passages from the Art of War and the Book of Slavery during his sleep. Through this intense process of coercive persuasion, Lee adopted Muhammad's belief system as his own. He became emotionally dependent on Muhammad, now in a foreign country with no one but Muhammad on whom to rely. Muhammad told Lee that his ultimate goal was to reunite with his children, who were wrongly taken from him by a corrupt and oppressive government. Lee was taught by Muhammad that right and wrong did not exist, that good and bad depended upon who benefitted and that the end justified the means. On traveling to different cities, Muhammad would point out slums and ghettos, inciting Lee's anger at the unfairness of the world, while teaching him to channel that anger to change the world as Muhammad wanted.

Lee was no longer a teenager from Jamaica with aspirations of becoming a success in America but a soldier in Muhammad's war to reunite his family and punish the government in the process. Although initially drawn to Muhammad out of his depression and the absence of a stable and loving parent, Lee was ultimately the victim of intense coercive persuasion that resulted in his losing his own sense of identity, becoming desensitized to an escalating pattern of violence and becoming totally dependent on and subservient to the dictates of Muhammad. Lee became a soldier in Muhammad's personal war on America. At the time of the offense, Lee Malvo was totally dominated in his thinking and behavior by John Muhammad.

To:     Michael S. Arif, Esquire
        Craig S. Cooley, Esquire
Re:     Commonwealth v. Lee Boyd Malvo


As a result of John Muhammad's prolonged and intense coercive persuasion, it is my opinion, to a reasonable degree of medical certainty, that on October 14, 2002, Lee Malvo was severely impaired in his ability to distinguish right from wrong and was severely impaired in his ability to resist the impulse to commit the act.

Respectfully submitted,

Neil Blumberg, M.D., F.A.P.A.

NB:esp

*CVA Consulting Services, Inc.*



October 25, 2006

Mr. William Brennan, Esq.
Mr. Timothy Sullivan, Esq.
Brennan, Sullivan & McKenna, LLP
5407 Water Street
Suite 105
Upper Marlboro, MD 20772

Re: State of Maryland vs. Lee Boyd Malvo

Dear Counselors:

Below is a pre-sentencing report on behalf of Lee Boyd Malvo. It is intended to be used to supplement the pre-sentencing report submitted by the state at the time of sentencing. The report is presented in an effort to assist the court in determining sentence, particularly as this relates to conditions of confinement. Foundational to the report is a brief social history review of Lee Malvo and the growth that this social worker has witnessed in Mr. Malvo since his conviction of Murder charges in Chesapeake in 2003.

### Introduction

Lee Boyd Malvo is a twenty-one year-old Jamaican-born male who is currently incarcerated at the Montgomery County Correctional Facility where he awaits sentencing after pleading guilty to murder charges on October 10th, 2006. Previously, Mr. Malvo was convicted of capital murder in Virginia and was given a life sentence. Through interviews conducted with Mr. Malvo, as well as his social history investigation, it is my opinion that Mr. Malvo will benefit from a program of continued mental health treatment in keeping with his sentencing and incarceration.

Over the years since his trial in Chesapeake, Mr. Malvo, continues to have difficulty in comprehending and coping with the enormity of the crimes which he committed under the control of John Muhammad. "It happened so fast. It went from wanting to go to school to killing. How did it happen so fast? What inside of me could Muhammad use to make me do what I did?" Lee asks. He has expressed deep remorse for his actions and constantly ponders the fate of the families, especially of the children who have been traumatized by his actions. While this report is not offered as an excuse for his actions, it is hoped that they will be placed within the context of his life, and the extreme control that the older John Muhammad had over him at the time of the murders and other offenses.

1

## Social History

Lee Boyd Malvo was born on February 18,1985, to Leslie Malvo and Una James at the Victoria Jubilee Hospital in Kingston, Jamaica. He was the only child from the union of his parents, but he had two half-siblings, Rohan and Tracy, born to his father. Lee is the only child born to his mother. In the first five years of his life, Lee enjoyed a happy childhood. He lived in a house with both parents. His father was a mason and his mother was a seamstress. They worked hard to provide for him and his father was saving towards buying a house for the family.

From early in his development, Lee was introduced to books and the ethic of academic study. His mother, Una, gave him books and building blocks as toys. In her zeal to initiate Lee into book learning, she sheltered him and discouraged normal childhood interactions. If Lee went outside to play with other boys his age, she would call him inside. She discouraged his participation in sports and encouraged him instead to find a book and read, or to do drawing. She backed up such encouragement with corporal punishment and a strict disciplinary code, which Lee said discouraged dissent.

Although Lee loved his mother and cultivated her desire for him to study, he developed a special bond with his father, Leslie. According to Lee, his father allowed him to be a child. This does not mean that Leslie did not also discipline him, but, as Lee explained, Leslie would balance discipline with nurture. It was Leslie who would take Lee out and buy him treats such as ice cream. It was Leslie who would sometimes intervene and override Una, telling her to "let the boy play." Lee loved both parents, but it was his father's presence that made him happy. The relationship with his mother, who has since been diagnosed with Bi-Polar disorder, was an inconsistent one. If she was in a good mood she would sit with him and teach him how to draw. However when his mother saw that he was becoming too skilled at drawing she tried to beat him out of it. She did not want him to be an artist; she wanted him to be a doctor. There was no such inconsistency with his father. Father and son had a great bond that was admired by many persons who knew them from the impoverished community where they lived in Oakland Gardens, Kingston. Lloyd Barrett, a neighbor who testified at the Virginia trial recalled that Leslie was a role model for him on how a father should interact with his son. For Lee, Leslie was patient and loving father who stood as a buffer between him and his mother's brimstone approach to parenting.

Lee recalled an incident very early in life when he played a broke a valued vase that belonged to his mother. He was only two and a half years old but he shivered with fear at the punishment that he expected to receive when his mother discovered that her porcelain vase was broken. His father told him not to worry. When his mother returned home and saw the broken vase she screamed for Lee; however it was his father who stepped to her and said "Leave the boy alone. I broke it. You'll buy another one next week." His father was his hero.

Leslie wanted to provide a better environment for his son and also for Una. To that end he moved to a more residential area of Kingston and sent Lee to a private school where his academic abilities were encouraged. In his quest for a better life, Leslie was also going to Grand Cayman or a regular basis in order to work but the separation from Una was taking a toll on the relationship. Una has since admitted that she never loved or cared for Leslie and became involved with him only because she was pressured by her sister, and because she needed the financial assistance that he provided for her. Una found other love interests and she accused Leslie of being involved with another woman in Grand Cayman. The arguments led to physical altercations and Lee recalled his father punching his mother in her mouth. She took a cutlass and chopped him on his right hand. This was his first exposure to domestic violence. To punish Leslie, Una neglected Lee refusing to have anything to do with him or his father. She hated the fact that the boy showed preference to his father and would turn on the son to punish the father. Leslie did the housework, prepared his meals, gave him his bath, took him to and from to school and helped him with his homework. According to Lee, "Those two weeks was the best period in my life."

In 1990, when Lee was only five years old, he was suddenly and unceremoniously separated from his father, Leslie. The separation came about while Leslie was working on a six-month contract in Grand Cayman. Shortly before Leslie returned to Jamaica, and without his knowledge, Una took Lee and went to an isolated, rural district called Endeavor. Leslie recalled the shock of returning home to an empty apartment and an empty bank account. He had added Una's name to his bank account and was sending money on a regular basis. Lee remembers the trips to the Western Union to collect the funds.

The separation from his father, and the manner in which it was executed, proved traumatic for Lee. His mother became romantically involved with another man who himself was abusive. There was no longer any balance. He was restricted and beaten and there was no one to save him. In interviews with his cousins, they recall the severity of the beatings that Lee was subjected to. Maintaining good grades was very important to Una. He recalled that there was a 3 -1 ratio for each incorrect answer that he got. There were three lashes with a leather belt for each incorrect answer. It was a daily routine for her to go through his book and see how many incorrect answers he got. If there was a total of eight wrong answers he received a total of 24 lashes. Nonetheless by the school's standard he was the brightest child in the class. His teachers recalled that he was an excellent a student and a pleasure to work with. When he graduated from the Basic School in neighboring Brown's Town he was Student of the Year and the 'Head Boy.' Although he subjected himself to his mother's dictates and discipline, and by all accounts, was a studious and well-behaved boy, Lee never recovered emotionally from the separation from his father.

Leslie made attempts to find Lee and Una, and was finally able to locate them in the hills of Endeavor. Lee shared with his father the abuse that he was being subjected

to, feeling confident that his father would put an end to it. Leslie begged Una to return to him. He promised that he would do everything in his power to make things right. Lee was hopeful that he could get his parents back together and went for a coconut and two straws which he hoped they would share as a symbol of togetherness. This was something that he had observed them doing in the past. However Leslie was sent back to Kingston with his empty hands and a promise that he could have Lee on holidays. Leslie left Lee with two flight jackets, one black and one silver, that he had brought from the Cayman Island. It was at that point that Lee had a desire to become a pilot.

After about a year and a half, Una moved back to Kingston with her boyfriend Noy Lawrence. From the remote hills of Endeavor, Lee was relocated to one of the most dangerous, violent, and politically charged areas in Kingston where he and his mother shared a room in a tenement yard. Living in this environment exposed Lee to daily gun battles between the rivaling gunmen and the police. One day on his way to school he was caught in between a shoot out involving gunmen and the police. Upon hearing gunfire Lee ran for cover. A police officer, seeing that Lee may be in danger, chased after him to get him out of the range of fire. But there was a trap set for the policeman that neither he nor Lee saw. As the cop approached Lee, Lee heard a shot and when he looked behind him he saw the police officer's head blown off.

Lee was dragged into safety by the killer, and when the coast was clear the killer lifted him out of where he hid him. The smile that the killer had on his face turned into a deadly smirk. As he patted Lee's leg with the revolver the killer said, "Hear no evil, see no evil and speak no evil." Although Lee was only six and a half years old he knew what that ominous threat meant. He was to say nothing to the authorities. However he told his mother and after witnessing several other incidents of violence, including the murder of a cousin, Una decided that she had to get a better life for herself and her son.

When Lee was nine years old, his mother left him with an acquaintance, Veronica, and her husband, Barry. This was to enable her to travel to St. Maarten, to find work. Initially, Lee understood the reason for his mother leaving him. However, what should have been a temporary separation by his mother eventually took on the air of permanence. From that moment on, Lee's life became a roller-coaster ride of separation, house movements, parental neglect, rejection and abandonment. He was beaten frequently by Barry who resented his presence in the home. Rather than being sent to school regularly he was forced to sell vegetables out of a push cart. If he objected or did not do as good a job as was expected of him he was brutalized. His mother heard of the abuse and sent for him. When Lee visited his mother in St. Maarten, he entertained hopes that he would be allowed to stay with her. But he was sent back to Jamaica alone and encountered further rejection, when his father said that he (Lee) could not stay with him either. Leslie has since explained that he could not keep Lee at the time, because he was still working in Grand Cayman for six months of the year, and there would have been no one left at his house to take care of Lee. In Lee's childhood and fragile mind, however, his father did not want him.

At the direction of his mother, Lee returned alone to the isolated, rural district of Endeavor, St. Ann, to live with his aunt Marie. His mother also directed that he should tell school authorities that his father was dead. Lee therefore refrained from talking about his father and internalized his feelings of rejection. While Una encouraged Lee to think that his father had abandoned him, her own actions reinforced Lee's trauma. She would visit with Lee, periodically from St. Maarten. Those periodic visits were usually just long enough for her to enroll him in school, as well as to uproot him and stick him in the home of another friend, relative, or stranger.

Lee had stayed for various periods at approximately fifteen places since birth. Lee recalled that he would cry for his mother and that he was "being treated like a puss-kitten." The reference is to the way cats and their kittens are generally treated in Jamaica. Lee was speaking to his sense of abandonment and that, like a "puss-kitten," his life was worth nothing. Interestingly, Lee came to identify so much with being a worthless puss-kitten that he said he even started sleeping with a cat. When put in context, the revelation is startling, as generally children in Jamaica grow up seeing cats as wild and suspicious creatures that ought to be discouraged from entering the home. As such, while it is culturally normative for Jamaican children including Lee to grow up stoning cats, it is not culturally acceptable to sleep with cats. Lee felt so abandoned that he also cried and wrote to his mother that he felt like committing suicide. Lee said that, when he cried or complained his mother would visit, but those visits gave him little reassurance. He said that such visits generally resulted in her moving him again, and then she would depart suddenly.

What was traumatic about these upheavals that Lee was subjected to was the fact that, after each one, his mother yet again abandoned him. He was also subjected to further rejection by his father. At one stage he was deposited at a boarding house but after a while his mother failed to send the boarding fees. This led to frustrations for Lee who began to do poorly in his school work. He made a second attempt to get his father to take him. He recalled that he traveled to Kingston, a three hour ride by bus to see his father and beg him to take him. He neglected, was not being fed well, and he was also failing in school. His father gave him a couple hundred dollars, but turned him down. He remembered crying all the way back home, only to be chastised for coming home late.

### Education & Obedience to Authority

Because of Lee's many moves he attended several schools. Despite these moves Lee tended to perform admirably in the schools he attended. For Lee, his education was the one thing his mother seemed to care about during their separation. When Lee did well in school, he won his mother's approval. He also learnt that when he was not doing well in school, his mother would visit him to find out what was distracting him from his studies.

For the most part, Lee was seen as a student with plenty of academic potential. At York Castle High School, his teachers as well as the principal remembered him. His English teacher Ms. Winsome Maxwell remembered Lee as a friendly child, but she also saw sadness in him attributed to parental separation. Ms. Maxwell as well as other teachers, believed that if Lee was able to become more settled and focused he would consistently excel.

There is nothing in Lee's Jamaican school records, or reports from teachers, that paints him as violent, disruptive or disrespectful. The teachers who have taught him, as well as relatives and acquaintances with whom Lee stayed, have testified to his obedience. Lee was not one to challenge or go against authority, whether that authority was a parent, guardian or a teacher.

Nevertheless, Lee did have problems that affected his education. In his first year at York Castle High, bullies victimized him. As a result, Lee was taken to live with his cousin Simone Powell and transferred to Spaulding High School. He stayed at Spaulding High School for one term, where he received excellent grades -- As and Bs. The fact that Lee felt at home with Simone, who also helped him with his schoolwork, facilitated his excellent performance.

At Spaulding High School, Lee also formed a close relationship with the Text Book Coordinator, Althea Wilson. Mrs. Wilson recalled that Lee volunteered to assist her with the issuing and cataloguing of books. She said that Lee would come to her assistance after his classes were over and while he waited for his cousin Simone. After Una removed Lee from Simone's house, she reenrolled him in York Castle High School. There he continued to do well, but lacking emotional support, his scores were not as high as at Spaulding.

According to Onyeka Nevin's, his best friend at York Castle, Lee appeared jovial and happy on the outside, but he (Onyeka) could discern the sorrow beneath the façade. Onyeka, who is now at Medical School at the University of the West Indies, said that Lee had times when he was very quiet and alone. Furthermore, Lee would bemoan the fact that his mother was in Antigua. Onyeka said that Lee wanted to go to his mother in Antigua and not return, but he noticed that Lee never mentioned his father.

Onyeka said that he was impressed with Lee as a student. He said that although Lee was hurting emotionally, Lee maintained a positive attitude towards school. When Lee did his homework, it was always very well prepared and presented. He recalled that what was so outstanding about Lee was that Lee would go above and beyond what was required. He remembered that Lee would do extra research and would cheerfully share with the other students and provide help and explanation when asked. He added that Lee had a lot to contribute to the class and, while Lee could get everyone to laugh, Lee was not a class clown.

The other thing that stood out for Onyeka about his friend, Lee was his desire to give his life to Christ. He remembered an occasion when Lee was attacked by two older boys who wanted to play cricket but would not wait their turn to get the bat. Onyeka recalled Lee walking away from the confrontation saying that he was contemplating getting baptized. His pastor, Rev. Lorenzo King recalled Lee approaching him some months before he left the island, asking to be baptized. Lee had been raised in the Seventh Day Adventist Faith, and Rev. King remembered asking Lee if he was sure that this was something that he wanted to do and not something that he was doing because his elders expected it of him. "He told me that this was what he wanted and I felt confident that he was ready to turn his life over to Christ," Rev. King recalled.

There were two instances when Lee found stability. Once was with a cousin Simone Powell, referred to earlier, who had been asked to keep Lee after he had been abused by some older boys. Simone was a then recent graduate of teacher's college but she took an immediate maternal liking to Lee. Upon learning of the victimization that he suffered at York Castle, she gladly took him into her home. She became the mother that Lee never had. Lee said that he had felt he had found a caregiver and a home with his cousin. He flourished during the time that she was with him. She treated him kindly and set parameters that encouraged growth. Even though Una failed to send money for his upkeep, she took care of him, sharing what she could from the measly teacher's salary that she earned. However after less than year of stability with Simone Powell, Una returned to Jamaica for Lee.

Simone recalled the terror that engulfed Lee when he heard the knock on the door and recognized his mother's voice. "Please don't let her take me" Simone recalled him crying. She could not understand this fear and sought to reassure him. But Lee knew differently. Una took him with her that night and beat him so ferociously that he had welts all over his body. She made him promise that he would denounce Simone Powell and demanded that he never ally with anyone against her. To this day, Simone is still troubled by the change she saw in Lee when he returned to the home they shared and cursed her at the urging of his mother. Lee has since said that this was one of the hardest things he ever did. Lee said that his mother tended to get jealous if she suspected that he was getting attached to any woman except her.

Lee's childhood depression became so severe at one time that he tried to kill himself. He became tired of his mother's ranting. She had been deported from St. Maarten where she had been living for some months. She returned to Jamaica where she displaced her frustration on Lee. He was made to feel he was the source of everything bad that had happened to her. She wished that he was never born and he would amount to nothing. One day he got tired of the constant barrage of abuse and took a rope and went to hang himself. He made the noose and placed it around his neck then called out to his mother to let her know she would have her wish. Unknown to him however, a neighbor had seen when he climbed in the tree and placed the noose around his neck. This neighbor, Blacka, was just in time to catch Lee as he jumped. There was trauma to his neck and

eyes, and though he survived physically he has never recovered emotionally. Unfortunately, Lee did not receive any mental health intervention. Instead, two days after his suicide attempt, his mother, angered by Lee's acting out behavior, invited him to attempt suicide once more.

There was another home in which Lee was invited and where he made progress. That was in the home of his teacher, Winsome Maxwell. She was Lee's home room teacher and see said she saw signs of neglect and sadness in her student and asked her parents to take him into their home. Mr. Maxwell, Ms. Maxwell's father stated that Lee became the son he and his wife never had. They showered him with love and he flourished. He remembered that he had his own plot of land on Mr. Maxwell's farm where he grew his vegetables on the week ends. "It was a good feeling watching the plants grow." He began to put more effort in his school work and was able to get better grades. "At last the future was looking bright. I had been placed in all the classes I needed to pursue a career as an aviator," he remarked. However, less than a year later his mother took him away from the Maxwell's home.

## Antigua Brings Disappointment & Despair

Lee recalled that at first he was happy when his mother decided to take him with her to Antigua. He was hoping that he would finally have some stability. Unfortunately, the circumstances under which Una took Lee with her seemed to have less to do with providing Lee with a happy home, and more to do with her trying to protect her interest. According to Lee, his mother was jealous of his friendship with one of his female schoolmates, named Kedian. Lee was fourteen years old at the time and he had an attraction to Kedian. Lee said that there was no sexual intimacy in the relationship, and he liked Kedian because she was quiet and had nice ways. However, Lee recalled, when his mother found out about his friendship with Kedian, she (his mother) "gave me an ass whupping." Lee said that his mother had saved up all the receipts for money she spent on him, including his education, and that she warned him that no woman would reap the reward from her efforts. Shortly after finding out about his friendship with Kedian she had him sent to join her in Antigua.

It was in 1999 that Lee joined his mother in Antigua. He was fourteen years old and he joined her with anticipation and trepidation. At the time his mother was living in a one room shack with no bathroom facilities. It was a far cry from the Maxwell's home where he had his own room. At the time that he joined his mother she was working as a house cleaner for a prominent attorney on the island as well as working as a vendor on one of the main highways in the capital of St. John. Una was able to enroll Lee is one of the best private schools on the Island. It is run by the Seventh Day Adventist Church which was in keeping with Lee's Christian beliefs. Una was able to obtain the funds for his tuition from Theodore Williams, a man with whom she was romantically involved.

Within three to four months of bringing Lee to Antigua, Una left him again and went to St. Maarten. This was an extremely trying period for Lee and where his resolve to be the good obedient student was truly tested. In an interview with Elmore Martin, the owner of the room that Una shared with Lee, he said that it was not more than three to four months that Lee was left alone in the room. He said that at first he was not aware of the fact that Una was gone. However after the second month of not receiving rent, Lee told him that his mother was off the island. Mr. Martin said that he would not put out Lee on the streets because he was still a minor. However he disconnected the electricity because he could not see having to pay for electricity when he was not collecting rent. Mr. Martin said that there were many nights when he reflected on whether he may have contributed to the tragedy of Lee's downfall by acting more like a landlord rather than as a Christian who should have been mentoring the kid.

Lee recalled that period when he was left on his own in Antigua as a very difficult one. He recalled that he had to do his home work while sitting under a street lamp for light. Nonetheless he did well. In interviews with his teachers, they recall Lee as a hardworking student who attended class regularly and did well. No one knew the hardships that he suffered. His meals were limited to lentil beans and dumplings with sugar and water as his drink. His best friend in Antigua, John Sewsankar, currently at Oxford, remarked that Lee always had such a positive attitude that he could never have imagined that he was destitute and living by himself. Lee admitted that he was able to purchase a second hand computer with money he had saved, and was also able to buy a zip drive and a burner. With that he was able to make copies of CD's that he stole and sold at a reduced price.

His mother eventually sent for him to join her in St. Maarten as she was in the process of trying to get to the United States by boat. She had paid money to a trafficker, but after it became obvious that this person had neither the ways nor the means to get her to the United States she decided to return to Antigua. She was able to get Theodore to get her better living accommodations and she began to strategize her next move which she hoped would take her to the United States.

It was after returning to Antigua that Lee met John Muhammad. He was with his son at an electronics shop and Lee was mesmerized by the camaraderie that he observed between father and son. It was something that he longed for but which seemed out of his reach. He would visit the shop just to see and absorb the father/son bonding that existed between Muhammad and his son.

John Muhammad had the charisma that made people, adults and children flock to him. In interviews that were conducted with neighbors and associates who knew Mr. Muhammad while he lived in Antigua; they commented on how impressed they were by him and the devotion that he showed his children as well as all children that came into contact with him. Lee was impressed no less, and he longed for that bonding that he saw between Muhammad and his son.

Una learned that Muhammad was able to sell her passage to the United States. Within a month of learning this she was able to get the needed funds from Theodore and pay Muhammad for the fraudulent passport and passage to the United States. Once again she left Lee on his own. This was in December of 2000. Lee was 15 years old at the time. Shortly after she left, Lee became very ill. He recalled that he was too ill to even rise out of bed to get help. He was in bed for two days with a very high fever. Muhammad who by then had grown accustomed to having Lee stop by his home, became concerned when he did not see him. Muhammad went to Lee's home and saw him gravely ill. Muhammad took Lee and nursed him back to health. After this Lee and Muhammad were inseparable. He was like the guru and Lee his faithful disciple. He began to spend so much time with Muhammad that he eventually asked to live with Muhammad. This marked the beginning of the end for Lee Boyd Malvo, the young man who left Jamaica with dreams of studying Aeronautical engineering and becoming a pilot.

As Lee recalls it, Mr. Muhammad was the perfect father. The shabby clothes that he had were replaced by clothes which Muhammad bought him. His Christian faith was also being replaced by the teachings of Elijah Muhammad. Lee recalled that he was introduced to numerous books emphasizing white imperialism and black oppression. Within weeks of joining Muhammad, Lee began to change. Principal of the 7th Day Adventist High School, Dr. Aaron, as well as teacher Ms. Cheryl Morris, said that they noticed a change in Lee. The usually conformist Lee began to show some defiance. Dr. Aaron and Ms. Morris noted that Lee refused to participate in worship, and that he wanted to spread his newly found Islamic faith in the Christian school.

After Muhammad was detained by the Antiguan Authorities, Lee started to miss school so that he could look after Muhammad's children. It was in Antigua that Muhammad began to introduce Lee as his son, and Lee first called himself John Lee Muhammad. As Lee reflected on the his journey with Muhammad, he said that the point at which Muhammad won his loyalty and devotion was when Muhammad told him, "Good job son." This was after Lee had completed a task that Muhammad had given him. He had never before heard those words from his mother no matter how well he did.

## Move to The United States

In May of 2001, Lee, traveling as Muhammad's son entered the United States of America illegally and after a brief stint with his mother in Florida he traveled to the state of Washington join John Muhammad. Muhammad had informed Lee that the authorities had taken his children and he needed Lee to help him regain them. He also promised Lee that he would formally adopt him so that he could go to college and realize his dreams of becoming a pilot. Against his mother's wishes, he traveled by Greyhound Bus and joined Muhammad in Washington where they both resided in a shelter. Una's hold on Lee had finally broken. In the past she would leave him only to uproot him as she saw

fit. This time however Lee was determined that she would not take him from the arms of the man whom he saw as his father. She reportedly traveled to Washington and informed the authorities that her son was under the control of Muhammad. Though Lee and his mother were detained by immigration authorities, Muhammad was still able to get a hold of Lee upon his release.

## The Brainwashing

The level of brainwashing to which Lee was subjected was aimed at expunging Lee's past, personality, and his dovish Christian beliefs, and, in effect, wash his brain with Muhammad's "truth." For almost two years, including time in Antigua, Lee was systematically exposed to Muhammad's indoctrination and training. Before Lee accompanied Muhammad on the murderous rampage, Lee first had to kill himself psychologically. He had to get rid of the innocence that defined his being, and the compassion for others that was part of his life. Lee recalled that Muhammad would take him to the shooting range for practice and would tell him to project his own image as the target. According to Lee the first time he shot someone, the face that looked back at him was his own. It was important for Muhammad to ensure that he had erased from Lee his entire identity as an innocent Jamaican child, and to assume Muhammad's identity.

Muhammad controlled everything that Lee did. Muhammad decided what Lee ate and when he ate. He decided where Lee went, with whom Lee associated and imposed limits on that association. Muhammad decided when Lee should sleep and how he should sleep. He made him fall asleep to taped excerpts from the Art of War. He had him watch the Matrix about 100 times, until Lee saw himself as Neo and Muhammad as Morpheus. Neo was entrusted with saving the world. Muhammad had Lee watch Roots and other films that exposed racism. Lee was given a constant dose of anti-white and anti-American rhetoric. Muhammad had Lee believing that in order to save the world there must be sacrifices. He also had Lee believing that he, Muhammad, was going to establish a utopian society of 70 boys and 70 girls who were going to bring about a just world. At the time of the shootings, Lee believed that this was his holy mission.

## Lee's Intelligence

Much has been made of the issue of intelligence, particularly as this applies to Lee. It is clear that he regurgitated whatever he read or was told by Mr. Muhammad, but he showed very little by way of critical thinking. This might be due to two factors. The first could be that under Muhammad's control, his intellectual functioning had not yet realized that stage of critical learning. The second factor could be that his critical thinking abilities had been suppressed by a learned culture of obedience and subservience to authority, whoever and whatever that authority might be.

Lee's intellectual abilities are not disputed. However as an adolescent, his ability to read and articulate could not save him from the influence and sway of the experienced

and worldly-wise John Muhammad. Indeed, Lee had enough intellectual curiosity, coupled with desperation for acceptance, to fit Mr. Muhammad's purpose. When Lee left his mother in Florida to go and stay with Muhammad, Lee said he had three goals in mind. These goals were all integrated and, for Lee, they were integral to his being with Muhammad. The goals were to get adopted, to become a citizen, and to go to college. It was Lee's understanding that Muhammad identified with these goals. Lee thought that Muhammad was willing to facilitate the academic and personal ambitions he had shared with Muhammad.

Lee was so intellectually immature and emotionally vulnerable that he could not dissociate himself from Muhammad when he needed to. Lee was fifteen years old, when he first met Muhammad. He was a good, promising student, but at the time Lee was certainly no match intellectually or intelligence-wise for Muhammad. He accepted Muhammad's philosophies and doctrines uncritically, lacking both the intelligence and the will to rebut. Emotionally, and even physically, Lee saw himself as a little island boy looking up into the face of a big, respectable and authoritarian sounding U.S. Army veteran of the Gulf war. Muhammad was also accepting of Lee, and Lee was a boy looking for a father and a mentor. In Muhammad, he saw someone who would accept and protect him, rather than abandon him. Muhammad, with his three kids beside him, presented himself as both a father and mentor. Throughout his time with Muhammad, Lee saw himself as a "child under Mr. Muhammad's tutelage." Lee also said he so believed and trusted Muhammad, that if Muhammad "ordered" him to kill himself he would have done it. He professed that he feared disappointing Mr. Muhammad, because he feared losing Mr. Muhammad's acceptance and approval.

It would be a mistake to judge Lee's intelligence merely on his ability to absorb information and reproduce it. That ability was enough to get him good grades in high school, but in the real world, particularly the realm of people like Muhammad, Lee became like clay in a potter's hands. Lee recalls that in Antigua Muhammad had expressed interest in another boy, about his age. Muhammad, Lee said, talked about taking the boy with him to the United States, because the boy was bright in school. Fortunately for that boy, as bright as he was, he had parents who were wiser and not flattered by Muhammad's interest. Lee, however, had no one, and at an age when he needed guidance and supervision, he was left alone with Muhammad.

In a 1998--1999 report at York Castle High School, Lee's class teacher wrote that Lee was a "well-behaved boy, who was always willing to carry out given tasks." The comment illustrates what Muhammad found attractive about Lee. That is Lee's willingness, or his instincts for obedience to authority in executing a "given task." On the same school report, the year supervisor commented that Lee should be encouraged not to waste his potential. Unfortunately, the vulnerable Lee met a man who, rather than honor that learning potential in the young Lee, sought to exploit it for his own ends.

Lee's association with Muhammad, which led to the offenses for which he has pled guilty, has had a severe emotional and psychological impact on his development. In the initial interviews with Lee, what jumped out was the way in which he had assumed the identity of John Muhammad. Lee did not want to be called by his right name, but insisted on being called John Lee Muhammad. In the interviews he spoke not like a Jamaican child, but in the accent and tone of a senior African American male who had lived through racial segregation and oppression. He recited, it seemed verbatim, things Mr. Muhammad told him or coached him to say, and when challenged, Lee would declare that he (Lee) and Mr. Muhammad are one. He insisted from the first interview that Mr. Muhammad was "my father." Initially, he saw his attorneys as enemies or extensions of the oppressive system trying to execute his "father," Muhammad. Lee seemed prepared to sacrifice himself for Mr. Muhammad, as a way of proving that Mr. Muhammad's vision of the world was right. In speaking to Lee, it was clear that the "reality" of which he spoke was not that of a Jamaican seventeen year-old, but rather the regurgitated philosophies of the then forty-two year-old African American, John Muhammad.

## Detaching From Muhammad

The process of 'Cognitive Reframing,' which is used with victims of brainwashing, has been instrumental in reintroducing Lee to his own history, which seemed to have succumbed to Muhammad's. This approach resulted in enough improvement in Lee's interaction to get him to start cooperating with his legal team, so that his attorneys would be in a position to prepare his defense for his first trial. At the outset Lee's devotion to Muhammad was phenomenal. When asked what was it about Mr. Muhammad that engendered such loyalty, he said "My dad gave me consistency, one hundred percent unconditional acceptance and he led by example." This worker recognized that she had gain Lee's trust, and this could not be accomplished by challenging his devotion to Muhammad. It was important to join him in defense of his father until an alternative to Mr. Muhammad had been provided. That came about when this worker met with his biological father in Jamaica and taped his voice and brought it back to Lee. It was the first time that Lee was hearing his father's voice in years. His father talked about the good times that he and Lee shared before Lee was taken away from him. Lee smiled as he heard his father, in heavily accented Jamaican patois, recall the good times.

When Mr. Malvo spoke of the turn of events in his son's life you could hear the anger mixed with tears as he asserted that it was John Muhammad who destroyed his son. When Lee was informed of the anger that Leslie Malvo displayed and that, if given the opportunity, he would strangle John Muhammad for ruining Lee. Lee looked to the worker with tears in his eyes and said "He probably would." In that instance, Lee was given an alternative to Muhammad. He was given the hero father that he had been searching for since he was five years old. The father whom he wanted to save him from

the abuse at the hands of his mother, her paramours, and the many persons she left him with. He was, for a moment, the lost child being defended and protected by his father.

Hearing the voice of his biological father marked the turning point in the process of separating Lee from John Allen Muhammad. This worker became emboldened in asserting that she would address Lee in his given name rather than as John Lee Muhammad. From the outset, this worker insisted on speaking to Lee in their native Jamaican patois, and it was heartening to hear Lee respond in patois after listening to his father. Upon recognizing the improvement that had been made from hearing his father's voice it was decided that bringing someone from Lee's past to meet with and interact with him would make much progress in further detaching him from Muhammad. It was decided that Winsome Maxwell, his teacher from Jamaica, who once took him into her home, was the most suited person.

It was on Memorial Day weekend in 2003, that Lee saw his former teacher for the first time since she had put him on a plane and sent him to join his mother in Antigua. Ms. Maxwell had been battling feelings of guilt ever since Lee's predicament. She wondered if she should have defied his mother's wishes. She is haunted by the look on Lee's face as his eyes asked her if going to Antigua was in his best interests. "What could I have done? She was his mother and she wanted him."

Upon enquiring of his former class mates and how they were doing Lee asked his teacher; "How did this happen? What am I doing here?" "This is what we are here to find out Lee?" she responded. Ms. Maxwell, along with this worker was with Lee for a total of three days. On the first day he was Lee Malvo, her beloved student, anxious to hear about what was happening in the lives of his classmates and reminiscent of the days that he was in her home and treated like a brother. The following day he was John Lee Muhammad, spewing racial hate and regurgitating the doctrine that John Muhammad had so successfully imbued in him. "What could have brought about the change?" Ms. Maxwell and this worker both wanted to know.

Lee informed us that the nights were the hardest for him because it was then that he would hear the tapes by which he fell asleep while with Muhammad. He said that it was as if the tapes were still playing in his head at nights. "His voice was in my head," Lee recalled. *'They are trying to turn you against me. Your word is your bond. You are your greatest asset. Right now you are your greatest enemy. Are you willing to do whatever it takes? Are you willing to die for what you believe? We must become one;'* Muhammad kept telling him.

His loyalty to Muhammad and the assertion that he gave Muhammad his word, and his "word is his bond" was challenged by Ms. Maxwell. As she broke down in tears she asked Lee, "To whom do you owe loyalty? The man who brought you here, or me who took you into my home as my child and brother? Tell me who do you owe your loyalty to?" It was clear that this plea from his teacher made quite an impression on him.

He promised cooperating with his attorney and to reveal to them the things that he went through while under the control of John Allen Muhammad.

Low self esteem was one reason that Lee gave why he was vulnerable to succumbing to John Muhammad's control. "I had no one. Nobody cared what happened to me." He remarked. It was therefore important that a positive sense of self be reinforced by emphasizing his strengths rather than his weaknesses. Lee's progress has been gradual, and there were times especially in 2004 when it was noticeable that Lee would show signs of regression (back into his Muhammad identity.) The emotional conflict stemming from his childhood has been ongoing and is reflected in his writings. It was of great concern to this worker that Lee be sentenced to a facility where he could be availed of Mental health services. This was the not the case until he was transferred to the Montgomery County Correctional Facility. Since then he has made good progress.

However, while there has been improvement in Lee's mental state he still remains psychologically fragile. At age twenty one, he is not far removed from his childhood problems or from the traumatic events associated with his relationship with Muhammad. Failure to confront these events and trauma, within a clinical mental health structure, could very likely lead to Lee presenting with a range of disorders while incarcerated. Concomitant to the need for mental health intervention is that Lee, at age twenty one, still has the bulk of his life ahead of him. As seen through Lee's testimony on behalf of the state, his is a life that can still amount to some good, even behind bars.

There are three factors that should help in determining that Lee would benefit from psychiatric/psychological therapy.

- **Ability to Improve with Professional Guidance and Structure**
  Within the limited parameters of social history investigation, which defined my work with Lee, he showed signs of improvement in his demeanor and outlook. There was a pessimism and paranoia -- the world was out to get him -- which characterized his demeanor and vision in early meetings. Initially, Lee had shown little interest in even pursuing a high school equivalency diploma while incarcerated. He gave the impression that he had turned his back on the very notion of involving himself in the education offered to him by "the system." Muhammad had become not only Lee's "father" but also his teacher, and Muhammad had inculcated in Lee the notion that the system, with its education, was evil and detrimental to the black man. During the time Lee lived with Muhammad, day in and day out, Lee read the books Muhammad wanted him to read and learned the experiences Muhammad wanted him to experience.

  Traits of that pessimism and paranoia have been replaced with hope and a determination to reclaim the path he had set for himself but which was hijacked by John Muhammad. He began that renewed journey when he was

able to complete his High School Diploma through correspondence at American School in Lansing, Illinois. He was determined to get a high school diploma and not a GED and earned his diploma in December 2004. [See attached].

As if to illustrate the positive impact that even his minimal contacts with mental health professionals have had on him, Lee has expressed an interest in the study of psychology. Accordingly, he was recently accepted into a degree program at California Coast University to pursue his Associate Degree in Psychology. [See attached letter of acceptance] In a recent letter to this worker Lee stated that with the prospect of spending the remainder of his life behind bars, he hopes that in pursuing higher education particularly in the field of psychology, he hopes to gain an understanding of how he got to this point in his life. With that knowledge he hopes to be "a pen in the public consciousness" through what he does best, which is to write. In so doing he hopes that other Lee Boyd Malvos that are out there will not go down the path of destruction along which he was led.

Since his incarceration at the Montgomery Correctional facility, Lee has shown that, with increased and sustained contact with someone who had a professional understanding, he could improve his demeanor and respond to positive guidance. In the three years since his last trial, there has been significant overall improvement. His early drawings depicted themes of anger, rage and revolution. His most recent drawings, sent to members of staff at CVA, depict mixed themes of sadness, reflection and optimism.

- **The Importance of Continued Mental Health to Lee's Well-Being**
  Prior to trial, Lee was diagnosed with dissociative disorder. It is clear that Lee also suffered from Childhood Depression, and continues to be depressed. While not formally diagnosed, Lee might have some traits of Bi-polar disorder. His mother has been diagnosed with Bi-polar disorder and his maternal grandmother had spent many years in the Bellevue Asylum in Jamaica. There is a history of mental disorder in his family. There are other concerns such as susceptibility to post traumatic stress syndrome. Lee's problems have serious implications for his adjustment behind the prison walls. This observation is reasonable and understandable based on two actualities of Lee's incarceration.

The first actuality is that Lee's words and actions are demonstrative of trauma resulting from events in his childhood and, more significantly, his association with Muhammad including the shootings. Under Muhammad's influence, Lee's emotional conflicts -- particularly having to do with his abandonment -- were displaced and channeled into a paranoid and adversarial view of the

16

world. Under Muhammad, Lee's personality was introverted and inverted. Muhammad had Lee believing that he (Lee) was a chosen, but oppressed underdog, who was fighting for a great and just cause of liberation. Prior to his prolonged association with Muhammad, Lee generally respected authority-figures and was not defiant, adversarial or confrontational. As a child, he had a few problems with one or two guardians who were abusive to him. But his reaction, while childish (such as refusing to wash dishes), was not confrontational, abusive or violent. When Lee met Muhammad, he craved adult (particularly parental) acceptance and approval. However, Muhammad seized upon Lee's desperation and effectively became the sole authority in Lee's life, thus the only one to whom Lee should have had allegiance. Concurrently, Lee's orientation and personality was refashioned from that of a dove to that of a hawk engaged in war against the system.

The problem for Lee is that despite recognizing what his association with Muhammad has wrought, he is having a difficult time making sense of his own vulnerability, gullibility and culpability. Following his recent testimony against Muhammad, Lee had tremendous difficulty comprehending how Muhammad could have led him on a path of murder and destruction. "He is only a man" Lee asserted. "I feel stupid that I could have allowed myself to make him do this to me." He acknowledges his role in the murders for which he has pled guilty and bemoans the great loss to the victims. But he struggles with issues of his own identity and guilt, not knowing if the sniper was Lee Boyd Malvo (the promising student who was supposed to go to college), or John Lee Muhammad ("son" and loyal sidekick of Muhammad), or both.

The second actuality of Lee's incarceration is that he will be confronted with a culture and environment for which he was not prepared. Despite the four years that he has spent behind bars, Lee is still an adolescent emotionally, and while he may be book smart, he lacks social smarts. Lee presents as shy, and immature (even childish) in his disposition and interaction. Lee's exposure to the United States, except for a brief period with his mother, has been dictated by his association with Muhammad. For the approximately one year he spent in the United States prior to incarceration, Lee's exposure has been limited to living in a shelter with Muhammad, and to being on the road with Muhammad. Despite the enormity of Lee's offenses, he is as socially limited and vulnerable now as he was under Muhammad. So far, Lee has been kept isolated from the jail population, a factor that does not necessarily shield him from his inner conflicts. But given his age and limited experience, greater exposure to the inmate population could make Lee susceptible to grave psychological harm.

It is noteworthy that Lee has had no institutional infractions. This does not take away from the fact that as a first time offender among hardened repeat

offenders, whatever psychological problems he has could become magnified, and may even take on life-threatening proportions. Despite the traumatic changes to Lee's life, particularly in his association with Muhammad, he had not been afforded sustained clinical treatment until he was detained at the MCCF. The progress that he made confirms that Lee's case calls for clinical attention to be concurrent with sentencing.

- **Lee's Desire for Mental Health Therapy**
  In the Jamaican socio-culture that Lee came from, there is a strong stigma associated with mental illness or disorder. There is a compelling reluctance to admit to such disorder or even to entertain the notion of needing treatment or therapy. Given this cultural constraint, it was difficult for Lee to cooperate even with the mental health experts on the defense team. It has proven difficult for Lee to fathom the fact of his own emotional and mental dysfunction. Nevertheless, Lee has reached a point whereby he has seen wherein a program of therapy has been and can be beneficial to him.

## Remorse

It was in early March of this year when, on a visit, Lee stated that he wanted to testify against Mr. Muhammad. There was a sense of urgency as he requested this worker inform his attorneys of his desire to testify When his attorneys did not respond in a timely manner in seeing him he wrote to the District Attorney and told her of his desire to testify against Muhammad. "I need to do this for myself and for the victims," he said at the time when he was asked why he wanted to testify against Muhammad. This decision capped a period of deep remorse that Lee has been experiencing for the past two years.

At the time of his arrest, and even through the first trial Lee was devoid of feelings. He had successfully compartmentalized his actions and was thus unable to feel for his victims. A major part of the indoctrination process was the desensitization that Lee was subjected to by Muhammad, a process that was needed to enable Lee to carry out the murderous acts that Muhammad directed him to do. It was not until he was watching a seminar 'Inside the Criminal Mind' by Dr. Stanton Samenow, that he began to recognize the effects if his actions on the victims. He agonizes over the pain that he had wrought. He laments the lives that have been destroyed and cries for the children who lost their parents because of his actions. He ponders on how he can repay society for what he has taken away from it, and hopes to make restitution.

## Mental Health Summary

Dr. Denese Shervington, MD, forensic psychiatric and Director of Psychiatry at Harlem Hospital in New York had the following to say:

"The culmination of years of severe emotional and physical deprivation rendered Lee vulnerable to John Muhammad's brainwashing. Lee soon thereafter plunged into a psychotic dissociation, assuming the persona of the rage-filled self that Muhammad projected into Lee. Lee, who had previously tried to kill his old self, one that was plagued with self-hatred and blame for not being lovable enough to have his parents hold, guide and protect him, welcomed his new persona. Psychotic and dissociated from a hopeless, invisible and despairing self, 15 year old Lee was able to delude his self that he now had value, worth and most of all, someone who was loved by a father.

Post Lee's arrest and admission of guilt, and beginning with the cognitive reframing that was used to restore Lee to his true identity and himself, and culminating with his current therapy while in jail, Lee has made significant progress in regaining his sanity. In Lee's own words, "*I am now forced to face myself and see that this is the culmination of walking blind for 14 years. I ask myself, what in me made me a murderer? I now am dealing with guilt, anger, anguish, embarrassment and shame. I want to use my life to help others.*"

Diagnostic Impression:
H/O Bipolar Disorder with psychotic features – Evidenced by Mental Status Exam 10/24/06 which revealed grandiosity, mood swings (depressed to elated), pressured speech, together with a history of insomnia, irritability and hallucinations. Of note, Lee's mother and grandmother both suffer from Bipolar Disorder.

Prognosis:
In spite of the tremendous societal tragedy that occurred during Lee's psychotic decompensation, with the mental health intervention that Lee has received, he currently exhibits evidence of remission and tremendous remorse for his wrong doings. With on-going treatment, Lee offers tremendous potential for helping to prevent similarly abused and abandoned youth from going down his same path. Society would therefore benefit from ongoing mental health treatment for Lee, as such would help to transform this tragedy into violence prevention

## Conclusion

According to a popular saying, "A mind is a terrible thing to waste." Lee's mind should not be allowed to become a wasteland of pessimism and paranoia. There is evidence, based on this investigation and his education records, to indicate that Lee was seen as someone with good behavior and academic potential. Despite his childhood problems, Lee was seen as someone who would grow up to make a positive contribution to society. He was seen as being in the same league as his high school friend, Onyeka Nevins, who is currently studying medicine, or John Sewsankar who is at Oxford.

Today, Lee does not want his legacy to be merely "the sniper." He has successfully detangled himself from Muhammad's psychological hold, and was thus able

to publicly denounce Muhammad and his teachings and to side with the victims when he took the stand in June of this year. John Lee Muhammad, the creation of Muhammad is dead, and Lee Boyd Malvo has been resurrected. He is determined to reclaim the path that was hijacked by Muhammad, and though Lee realizes that he faces the prospect of spending the rest of his life in prison, he believes that he owes it to his teachers, his friends, society, and most significantly to those who have been tragically affected by his actions, to make amends.

Lee considers amends to include availing himself of avenues for rehabilitation and restitution. He believes that it is incumbent upon him to still make a positive and worthwhile contribution within the confines of incarceration, and if possible within society someday. His willingness to contribute is why he wants to reclaim that potential with which he was endowed as a child. That is why he desires to renew his mind by revisiting his ambitions of a college degree. He has begun that road of healing and renewal and he hopes that his testimony and acknowledgement of his wrongful deeds have provided a measure of healing for the victims. As Lee faces his punishment, let there also be hope of renewal, even within the walls of incarceration, and, to that end, may the court exercise discretion in recommending an appropriate course of mental health treatment.

Respectfully Submitted,

Carmeta V. Albarus -Lindo, LCSW

**LICENSED CLINICAL SOCIAL WORKER**
**LIC # R-051798-1**

20

Circuit Court for Montgomery County
Case No. 102675-C

Argued: February 8, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 29

September Term, 2021
_____

LEE BOYD MALVO

v.

STATE OF MARYLAND
_____

\*Getty, C.J.
\*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.
_____

Dissenting Opinion by Watts, J., which Gould,
J., joins.
_____

Filed: August 26, 2022

\*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, they also participated in the decision and adoption of this opinion.

Respectfully, I dissent.  I have no quarrel with the Majority's conclusion that this case is subject to the Supreme Court's holding in Miller v. Alabama, 567 U.S. 460, 489 (2012) that a trial court must consider a juvenile offender's youth and attendant circumstances before imposing a sentence of life imprisonment without the possibility of parole, which was made retroactive in Montgomery v. Louisiana, 577 U.S. 190 (2016).  See Maj. Op. at 22-24.[1]  That said, I would reach a different conclusion than the majority opinion based on the record in this case, which demonstrates that the Circuit Court for Montgomery County essentially complied with the forthcoming requirements of Miller by considering the youth or juvenile status of Lee Boyd Malvo, Petitioner, at sentencing.

The record in this case demonstrates that Mr. Malvo received an individualized sentencing procedure at which his youth was considered, and the circuit court recognized that it had the discretion to impose a lesser sentence than life without parole.  At the sentencing proceeding, while explaining the basis for the sentences, when speaking to Mr. Malvo, among other remarks, the circuit court stated: "As a child, you had no one to establish values or foundations for you.  After you met John Allen Muhammad and became influenced by him, your chances for successful life became worse than they already were."  Immediately afterward, the circuit court told Malvo: "You could have been somebody different.  You could have been better."

---

[1]On November 8, 2006, the circuit court conducted the sentencing proceeding.  On January 12, 2017, Malvo filed a motion to correct an illegal sentence.  Malvo contended, among other things, that the Supreme Court's decision in Miller applied to Maryland's discretionary scheme for imposing a sentence of life imprisonment without the possibility of parole.

The circuit court's explanation of the reason for the sentence demonstrates that it took Mr. Malvo's status as a juvenile into account. To be sure, at sentencing, the circuit court did not make an explicit finding that it would impose consecutive life without parole sentences despite Mr. Malvo's juvenile status or that Mr. Malvo was incorrigible. But the circuit court pointed out that Muhammad had corrupted Mr. Malvo while he was an impressionable child, observed that Mr. Malvo could have grown up to be a better person, and acknowledged that Mr. Malvo remained a young man at the time of the sentencing proceeding. The record demonstrates that Mr. Malvo received a personalized sentencing procedure at which his youth and its attendant characteristics were considered, and the circuit court was aware that it had the discretion to impose a lesser sentence. As such, the circuit court satisfied the requirements of the Supreme Court's holding in Miller. The conclusion that the Supreme Court's holding in Miller was satisfied in this case is supported by Jones v. Mississippi, ___ U.S. ___, 141 S. Ct. 1307, 1319 (2021), in which the Supreme Court held that, under Miller, a trial court is not required to find that a juvenile offender is permanently incorrigible before imposing a sentence of life imprisonment without the possibility of parole.

According to the majority opinion's interpretation of the Supreme Court's holdings in Miller and Jones, "an offender deemed corrigible cannot constitutionally be sentenced to life without the possibility of parole." Maj. Op. at 9. And "[n]o explicit finding of the offender's incorrigibility is a prerequisite to a sentence of life without parole; instead, a defense presentation of argument about the offender's youth and the exercise of the court's discretion to impose a no-parole sentence can serve as an implicit finding of

- 2 -

incorrigibility." Maj. Op. at 22.  I will not take issue with the Majority's distillation of the Supreme Court's holdings in <u>Miller</u> and <u>Jones</u> to the extent that the Majority concludes that after <u>Jones</u>, <u>Miller</u>'s substantive holding remains good law.

But in our recent opinion in <u>Harris v. State</u>, 479 Md. 84, 119-20, 276 A.3d 1071, 1092 (2022), we concluded that in sentencing Mr. Harris the trial court complied with <u>Miller</u>.  If that is so, the record in this case plainly demonstrates that the circuit court complied with <u>Miller</u> in sentencing Mr. Malvo.  In <u>Harris</u>, a case involving a sentence of life with the possibility of parole imposed after the Supreme Court issued <u>Miller</u>, we concluded that, although <u>Miller</u> did not apply and the trial court was not required to take youth into account before imposing a sentence of life imprisonment with the possibility of parole, the record demonstrated that at sentencing the trial court had indeed complied with <u>Miller</u>.  <u>See Harris</u>, 479 Md. at 119-20, 276 A.3d at 1092.  In <u>Harris</u>, in imposing sentence, the circuit court did not make any statements or observations whatsoever with respect to Harris's youth or juvenile status.  Instead, we concluded that the circuit court considered Harris's youthful status based on the circumstance that the circuit court received a presentence investigation report that mentioned the Harris's age, that Harris's counsel made arguments based on his age at the sentencing proceeding, and that a letter written by Harris in which he emphasized his age was read aloud at the sentencing proceeding.  <u>See</u> <u>id.</u> at 118-19, 276 A.3d at 1091.

Under these circumstances, we reached the conclusion that in imposing sentence the circuit court considered Mr. Harris's status as a juvenile and although *dicta* (because Mr. Harris received a sentence of life with parole), we concluded that the circuit court satisfied

the requirements of Miller. Measured against the standard that this Court set forth in Harris for determining whether a sentencing court considered a defendant's youth and attendant circumstances, the resentencing ordered by the Majority in this case is unwarranted. The circuit court plainly took Mr. Malvo's youth, *i.e.*, his juvenile status, into account at sentencing.

In a footnote, the Majority criticizes this dissent as equating the sentencing proceedings in Harris and this case. See Maj. Op. at 24 n.18. But rather than critiquing the dissent, the Majority's remarks reinforce its point. The sentencing proceeding in Harris occurred after the Supreme Court's announcement of the incorrigibility standard in Miller and Montgomery, *i.e.*, the sentencing in Harris occurred at a time when the trial court was presumed to have known the law. And indisputably, in reviewing the sentencing in Harris, this Court stated that "all *Miller* requires is an individualized sentencing proceeding where the sentencing judge has discretion to give the juvenile offender a sentence that is less than life in prison without the possibility of parole." Harris, 479 Md. at 117, 276 A.3d at 1090 (citation omitted). Thus, with the sentencing judge having made no acknowledgment of Harris's youth at all, this Court concluded that the sentencing proceeding in Harris would have fulfilled the requirements set forth by the Supreme Court in Miller. See Harris, 479 Md. at 119-20, 276 A.3d at 1092. Irrespective of the circumstance that the sentencing in this case occurred before Miller and Montgomery, the record clearly shows that the circuit court took Mr. Malvo's youth into consideration and that he was afforded an individualized sentencing proceeding. If we are to rely on the discussion of Miller and Montgomery that

this Court set forth in <u>Harris</u>, the remand ordered by the Majority in this case is plainly unjustified.[2]

Under the standard set by the Majority, every sentencing of a juvenile that occurred before the Supreme Court's decision in <u>Miller</u> and resulted in a sentence of life without parole would be subject to resentencing—because the sentence occurred before <u>Miller</u>. In this case, it could not be more evident that the sentencing judge took Mr. Malvo's juvenile status into account, even though the sentencing proceeding occurred before <u>Miller</u>. The circumstance that a juvenile sentencing may have occurred before the Supreme Court's holding in <u>Miller</u> does not automatically mean that the sentencing judge failed to consider the juvenile's age and youthful characteristics or to provide an individualized sentencing proceeding.

It is not the timing of the sentencing in Mr. Malvo's case that raises an issue. Rather, it is that in its discussion of what is required under <u>Miller</u> of a sentencing judge, this Court explained in <u>Harris</u> a view that would be consistent with affirming the sentence in Mr. Malvo's case. But, now, the Majority raises the bar as to what <u>Miller</u> requires and, in doing so, authorizes a resentencing for Mr. Malvo. The Majority does not attempt to rectify the dichotomy between its discussion of <u>Miller</u> in this Court's opinion in <u>Harris</u> and the conclusions reached in this case.

The reality is that it is difficult to conceive of more egregious offenses committed by a juvenile than those committed by Mr. Malvo. Mr. Malvo's murders were numerous,

_____

[2]The Majority's statement that the dissent equates the <u>Harris</u> and <u>Malvo</u> sentencings is obviously not accurate and requires no further response. <u>See</u> Maj. Op. at 24 n.18.

carefully planned, involved random victims whom he did not know, took place in public over a prolonged period of time, and terrorized multiple communities. In sum, Mr. Malvo engaged in a series of arbitrary public executions of people who happened to be outdoors. The record reflects that although the circuit court considered Mr. Malvo's youth, it determined, among other things, that the nature of the offenses outweighed the circumstance that he was seventeen years old when he committed the offenses.  In other words, the circuit court considered the circumstances of the six murders, and Mr. Malvo's youth and its attendant characteristics as required by Miller, and imposed six consecutive sentences of life imprisonment without the possibility of parole given the unprecedented and heinous nature of the offenses.

For the above reasons, respectfully, I dissent.

Judge Gould has authorized me to state that he joins in this opinion.

Circuit Court for Montgomery County
Case No. 102675C
Argued: February 8, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 29

September Term, 2021

_____

LEE BOYD MALVO

v.

STATE OF MARYLAND

_____

\*Getty, C.J.,
\*McDonald,
Watts,
Hotten,
Booth,
Biran,
Gould,

JJ.

_____

Dissenting Opinion by Hotten, J., which
Gould, J., joins.

_____

Filed: August 26, 2022

\* Getty, C.J. and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Maryland Constitution, Article IV, Section 3A, they also participated in the decision and adoption of the majority opinion.

I respectfully dissent. Petitioner, Lee Boyd Malvo, received sentences that were just, fair, and compliant with the United States and Maryland Constitutions.

When Petitioner was 17-year-old, he, together with John Allen Muhammad, perpetrated one of the most heinous series of crimes in the history of the State. Between October 2 and 22, 2002, Petitioner and Mr. Muhammad systematically murdered six people in Montgomery County, Maryland. Their victims were targeted at random, in the course of their daily activities, and shot by Petitioner and Mr. Muhammad with a long-range rifle fired from a vehicle outfitted with a sniper's nest in its trunk. The victims included: James Martin, who was killed in a parking lot of a Shoppers Food Warehouse; James Sonny Buchanan, who was killed while mowing the lawn; Premkumar Walekar, who was killed while fueling his car at a gas station; Maria Sarah Ramos, who was killed while sitting on a bench at the Leisure World Shopping Center; Lori Ann Lewis-Rivera, who was killed while vacuuming her minivan at a gas station; and Conrad Johnson, who was killed stepping out of a commuter bus. In addition, a student, Iran Brown, was shot and severely wounded on the grounds of his middle school in Prince George's County.

These crimes were a part of a larger spree that spanned into Virginia and the District of Columbia, during which Petitioner and Mr. Muhammad killed ten people and attempted to kill three others. Petitioner and Mr. Muhammad became known as the "Beltway Snipers" and intentionally perpetrated a "reign of terror" over the Washington, D.C. metropolitan area and Montgomery County in particular. *Muhammad v. State*, 177 Md. App. 188, 198, 934 A.2d 1059, 1065 (2007). Petitioner and Mr. Muhammad left threatening notes near the scenes of their crimes, including one that said: "P.S. your

children are not safe anywhere at any time." *Id.* at 210–11, 934 A.2d at 1072. Many more murders were planned and doubtless would have been carried out, had authorities failed to capture Petitioner and Mr. Muhammad on October 24, 2002.

For each of the six murders committed in Maryland, Petitioner received a sentence of life imprisonment without the possibility of parole, to be served consecutively with each other and with any sentence imposed by another jurisdiction. Petitioner has yet to serve any of his Maryland sentences. Thus far, he has been serving sentences in Virginia that were imposed for the murders he committed in that State. Virginia recently passed legislation making any juvenile eligible for parole after serving twenty years in prison. *See* Va. Code Ann. § 53.1-165.1E (2020). As the twenty-year anniversary of the Beltway Sniper attacks approaches, Petitioner has chosen to challenge the validity of his Maryland sentences.[1]

The Majority believes that a recent series of United States Supreme Court cases, addressing the circumstances under which the Eighth Amendment of the United States Constitution permits a juvenile offender to be sentenced to life in prison without the possibility of parole, likely renders Petitioner's sentences unconstitutional and requires his resentencing. I disagree. As will be discussed in greater detail below, the most recent iteration of that line of cases, *Jones v. Mississippi*, ___ U.S. ___, 141 S. Ct. 1307 (2021), unequivocally holds that *all* that is procedurally required prior to sentencing a juvenile

---

[1] In February 2020, the United States Supreme Court dismissed another case filed by Petitioner that challenged his life-without-parole sentence in Virginia given the recent passage of Va. Code Ann. § 53.1-165.1E (2020). Petitioner could be eligible for parole in Virginia this year.

offender to life in prison without the possibility of parole is an individualized sentencing proceeding in which the court has discretion to sentence the offender to less than life without the possibility of parole. Petitioner received the required sentencing proceeding. The sentencing court had the discretion to impose a sentence of less than life in prison without the possibility of parole and considered mitigating factors such as Petitioner's youth and its attendant circumstances prior to sentencing. The record confirms that the sentencing court considered those mitigating factors, including Petitioner's immaturity and ability to reform, prior to sentencing, but nonetheless, determined Petitioner's crimes warranted life in prison without the possibility of parole. The sentencing court was permitted to do so under the Eighth Amendment.

Neither were Petitioner's sentences unconstitutionally disproportionate as applied under the Eighth Amendment, as Petitioner's crimes were not the result of "transient immaturity." Article 25 of the Maryland Declaration of Rights affords no additional protections beyond those provided under the Eighth Amendment. Finally, any alleged deficiencies in Petitioner's sentence have been cured by the General Assembly's passage of the Juvenile Restoration Act ("JUVRA"). For the foregoing reasons, which are described below, I would affirm Petitioner's sentences.

**The Eighth Amendment and Juvenile Sentencing**

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments[.]" U.S. CONST. amend. VIII. This guarantee "flows from the basic precept of justice that punishment for crime should be graduated and proportioned

3

to both the offender and the offense." *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 2463 (2012) (cleaned up).

In *Graham v. Florida*, the United States Supreme Court held that the Eighth Amendment categorically prohibited a juvenile nonhomicide offender from being sentenced to life without the possibility of parole. 560 U.S. 48, 82, 130 S. Ct. 2011, 2034 (2010), *as modified* (July 6, 2010). The Court elaborated that a state "is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime" but must impose a sentence that provides "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at 75, 130 S. Ct. at 2030. The Court stated the Eighth Amendment does permit some juvenile non-homicide offenders to be incarcerated for life, as "[t]hose who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives." *Id.*, 130 S. Ct. at 2030. However, it prohibited courts "from making the judgment at the outset that those offenders never will be fit to reenter society." *Id.*, 130 S. Ct. at 2030.

Two years later, in *Miller v. Alabama*, the United States Supreme Court addressed the relevance of the Eighth Amendment to juveniles sentenced to life without the possibility of parole for homicide offenses. 567 U.S. 460, 465, 132 S. Ct. 2455, 2460 (2012). The Court declined to categorically prohibit all sentences of life without parole for juvenile offenders, but instead held that the Eighth Amendment prohibits states from imposing *mandatory* life sentences without parole for homicide offenses. *Id.*, 132 S. Ct. at 2460. The Court reasoned "youth matters in determining the appropriateness of a lifetime

4

of incarceration without the possibility of parole[,]" *id.* at 473, 132 S. Ct. at 2465, and sentencing schemes that impose "mandatory life-without-parole sentences on juvenile homicide offenders[] . . . by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 476, 132 S. Ct. at 2467.

Alternatively, the Court required "that a sentencer have the ability to consider the 'mitigating qualities of youth[]'" through an individualized sentencing proceeding in which the sentencer had discretion to give a lesser sentence. *Id.*, 132 S. Ct. at 2467. The Court listed some of the "hallmark features" of youth that mandatory life-without-parole sentences prohibit sentencers from considering, including: "immaturity, impetuosity, and failure to appreciate risks and consequences[,]" "the family and home environment[,]" the "extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected him[,]" the "incompetencies associated with youth" including the "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys[,]" and "*the possibility of rehabilitation*[,]" *i.e.*, corrigibility. *Id.* at 477–78, 132 S. Ct. at 2468 (emphasis added). These are not a checklist of "factors" the Court in *Miller* required every sentencing judge to review before sentencing. Rather, they are examples of mitigating qualities of youth that are precluded from consideration by mandatory life-without-parole sentences.

The Court in *Miller* concluded its opinion by stating that

[w]e therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. . . . By making youth (and all that accompanies it) irrelevant to

5

imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.

*Id.* at 479, 132 S. Ct. at 2469. The Court declined to categorically prohibit the imposition of sentences of life without the possibility of parole for juveniles, recognizing that a sentencing judge may find "the rare juvenile offender whose crime reflects irreparable corruption[]" justifying such a sentence. *Id.* at 479–80, 465, 132 S. Ct. at 2469. It stated that "[a]lthough we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480, 132 S. Ct. at 2469 (footnote omitted). In *Montgomery v. Louisiana*, 577 U.S. 190, 212, 136 S. Ct. 718, 736 (2016), *as revised* (Jan. 27, 2016), the Court held *Miller* announced a substantive rule that applied retroactively.

Any doubt regarding the precise holding of *Miller* was quelled last year, in *Jones v. Mississippi*, __U.S. __, 141 S. Ct. 1307. In that case, the Court explained that *Miller* does not require a sentencer to make a specific finding as to a juvenile homicide offender's permanent incorrigibility before sentencing the offender to life without the possibility of parole, so long as the sentencer has the discretion to give a lesser sentence. *Id.* at __, 141 S. Ct. at 1319. The Court unequivocally held that "[i]n a case involving an individual who was under 18 when he or she committed a homicide, *a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient.*" *Id.* at __, 141 S. Ct. at 1313 (emphasis added) (footnote omitted).

6

The Court in *Jones* was incredibly clear that, so long as a sentencing judge has discretion to consider a juvenile youth in sentencing, it *necessarily* will consider the defendant's youth. It stated:

> *First*, and most fundamentally, an on-the-record sentencing explanation is not necessary to ensure that a sentencer considers a defendant's youth. Jones's argument to the contrary rests on the assumption that meaningful daylight exists between (i) a sentencer's discretion to consider youth, and (ii) the sentencer's actual consideration of youth. *But if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily will consider the defendant's youth*, especially if defense counsel advances an argument based on the defendant's youth. Faced with a convicted murderer who was under 18 at the time of the offense and with defense arguments focused on the defendant's youth, *it would be all but impossible for a sentencer to avoid considering that mitigating factor.*
>
> It is true that one sentencer may weigh the defendant's youth differently than another sentencer or an appellate court would, given the mix of all the facts and circumstances in a specific case. Some sentencers may decide that a defendant's youth supports a sentence less than life without parole. Other sentencers presented with the same facts might decide that life without parole remains appropriate despite the defendant's youth. *But the key point remains that, in a case involving a murderer under 18, a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor.*

*Id.* at __, 141 S. Ct. at 1319–20 (some emphasis added) (footnotes omitted).

Whether a juvenile sentence of life in prison without the possibility of parole is "constitutionally sufficient" under the Eighth Amendment depends upon the presence discretionary sentencing procedure.[2] It is decisively *not*, as the majority holds, whether the

---

[2] The Majority contends that *Miller* imposed a substantive requirement that the sentencing court make a determination, at least implicitly, of permanent incorrigibility that is distinct and apart from this procedural requirement. *Malvo v. State*, No. 29, Sept Term 2021, op. at 24 n.18 (Md. Aug. 26, 2022). This interpretation was expressly rejected

(continued . . )

7

(. . . continued)

    by the United States Supreme Court in *Jones*:

> Jones relies on language in *Montgomery* that described *Miller* as permitting life-without-parole sentences only for "those whose crimes reflect permanent incorrigibility," rather than "transient immaturity." 577 U.S. at 209, 136 S. Ct. 718. In other words, because the *Montgomery* Court deemed *Miller* to be a substantive holding, and because *Montgomery* said that life without parole would be reserved for the permanently incorrigible, Jones argues that the *Montgomery* Court must have envisioned a separate factual finding of permanent incorrigibility, *not just a discretionary sentencing procedure where youth would be considered.*
>
> *That is an incorrect interpretation of* Miller *and* Montgomery. We know as much because *Montgomery* said as much. To reiterate, the *Montgomery* Court explicitly stated that "a finding of fact regarding a child's incorrigibility . . . is not required." 577 U.S. at 211, 136 S. Ct. 718.
>
> *To break it down further:* Miller *required a discretionary sentencing procedure.* The Court stated that a mandatory life-without-parole sentence for an offender under 18 "poses too great a risk of disproportionate punishment." 567 U.S. at 479, 132 S. Ct. 2455. Despite the procedural function of *Miller*'s rule, *Montgomery* held that the *Miller* rule was substantive for retroactivity purposes and therefore applied retroactively on collateral review. 577 U.S. at 206, 212, 136 S. Ct. 718. But in making the rule retroactive, the *Montgomery* Court unsurprisingly declined to impose new requirements not already imposed by *Miller*. As *Montgomery* itself explained, the Court granted [*certiorari*] in that case not to consider whether the rule announced in Miller should be expanded, but rather simply to decide whether *Miller*'s "holding is retroactive to juvenile offenders whose convictions and sentences were final when *Miller* was decided." 577 U.S. at 194, 136 S. Ct. 718. On the question of what *Miller* required, *Montgomery* was clear: "A hearing where youth and its attendant characteristics are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." *Id.*, at 210, 136 S. Ct. 718 (internal quotation marks omitted). But a separate finding of permanent incorrigibility "is not required." *Id.*, at 211, 136 S. Ct. 718.

*Jones*, ___ U.S. at ____, 141 S. Ct. at 1316–18 (emphasis added) (footnote omitted). As *Jones* is the most recent word on the matter, it is the case we must follow.

8

sentencing court, at least implicitly, found the juvenile to be "incorrigib[le]." *Malvo*, op. at 22; *see Jones*, ___ U.S. at ___, 141 S. Ct. at 1320 ("[A]n on-the-record sentencing explanation with an implicit finding of permanent incorrigibility is not required by or consistent with Miller."). Contrary to the assertions of the Majority and Petitioner, a sentencing court's consideration of an offender's youth and its attendant characteristics, including his potential for corrigibility, is not dependent on the sentencer's previous knowledge of *Miller* or its progeny. *See Malvo*, op. at 23–25. Rather, as the Court in *Jones* explained, when a sentencing court has discretion to consider a defendant's youth, it "*necessarily* will" consider it, "it would be all but *impossible* for a sentencer to avoid" considering it, and the sentencing court "*cannot avoid*" considering it. *Id.* at __, 141 S. Ct. at 1319–20 (emphasis added). In fact, the Court explained in a footnote that the only conceivable way for a sentencer to not consider a juvenile offender's youth when given discretion to do so is if defense counsel somehow failed to make the sentencer aware that the offender was a juvenile. *Id.* at __ n.6, 141 S. Ct. at 1320 n.6. Yet the Court said that *even in that* "*highly unlikely scenario*, the defendant may have a potential ineffective-assistance-of-counsel claim, *not a* Miller *claim*[.]" *Id.*, 141 S. Ct. at 1320 n.6 (emphasis added). The proposition that a sentencing court, which has discretion to impose a sentence less than life without the possibility of parole, could violate *Miller* simply because it did not expressly consider the juvenile offender's youth and its attendant circumstances, directly contradicts the United States Supreme Court's opinion in *Jones*.

The holding in *Jones* also makes practical sense. No sentencing judge is unaware that youth entails certain infirmities in decision making due to immaturity or that juveniles

9

generally have a greater capacity to reform than adults. To say that a sentencing judge, who has discretion and is tasked with considering mitigating and aggravating factors prior to sentencing a juvenile offender, would not consider an offender's youth and its attendant characteristics as mitigating factors simply because he or she did not yet have the benefit of reading the United States Supreme Court's decision in *Miller*, contradicts both common sense and the express holding of *Jones*.

**Petitioner's sentences did not violate the Eighth Amendment**

Petitioner's sentences were not violative of the Eighth Amendment under *Miller* and *Jones*. It is uncontested that the sentencing court in Petitioner's case had the discretion to sentence Petitioner to less than life without the possibility of parole and was aware that he was a juvenile when he committed the murders. That alone is sufficient under *Miller* and *Jones* to find that the sentencing court considered Petitioner's youth and its attendant circumstances prior to rendering its sentence. The record in this case goes even further, and *explicitly* demonstrates the sentencing court's consideration of Petitioner's youth and its attendant circumstances.

As contemplated in *Jones*, many of defense counsel's arguments during Petitioner's sentencing hearing focused on his youth and its attendant circumstances. *See Jones*, ___ U.S. at ____ 141 S. Ct. at 1319 ("But if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily *will* consider the defendant's youth, *especially if defense counsel advances an argument based on the defendant's youth*.") (some emphasis added). In seeking to mitigate Petitioner's sentence, defense counsel stated, among other things:

10

[T]his young man, but for the random intervention of John Allen Muhammad in his life, would not be sitting in a courtroom in Maryland, would not be sitting in a cell in Red Onion in Pound, Virginia for the rest of his life.

At the tender age of 15 or 16, John Allen Muhammad, who I join the choir of people to say is a coward, took this young man under his wing when there was no one else in the world to take care of this young man, and he turned him into a killing machine.

\*　　\*　　\*

But it is an absolute tragedy, absolute tragedy that this young man was abandoned and led down a road of random violence, murder, and hatred . . .

\*　　\*　　\*

. . . soon, there will be no Lee Boyd Malvo in our community anymore, and Your Honor, I think that's a sad thing because this young man has potential, and he has a future, and he'll have to do it from a prison cell in Virginia.

A pre-sentence investigative report was also submitted to the sentencing court for consideration in rendering its decision. The report noted Petitioner's age and described in detail, among other things, his difficult upbringing and abusive family situation, which led him to come under the sway of Mr. Muhammad and his hateful ideology. The State also acknowledged at the sentencing hearing the relevance of Petitioner's youth to culpability for his crimes:

It's not lost upon the State that [Petitioner] was under the sway of a truly evil man who infused a 17-year-old with the ideology of hate, an ideology, it appears that Mr. Malvo has now escaped from.

He's probably most tragic, Your Honor, because he can add his name to those [sic] long list of names, of those persons whose lives Mr. Muhammad destroyed.

Finally, the sentencing court's own statements prior to pronouncing the sentence reflected a consideration of Petitioner's youth and attendant circumstances:

11

As a child, you had no one to establish values or foundations for you. After you met John Allen Muhammad and became influenced by him, your chances for a successful life became worse than they already were.

You could have been someone different. You could have been better. . . .

These mitigating circumstances, emphasized by defense counsel, described in detail in the pre-sentencing investigation, acknowledged by the State, and reiterated by the sentencing judge, cover nearly all of the "hallmark features of youth" discussed in *Miller*, including: "immaturity, impetuosity, and failure to appreciate risks and consequences[,]" "the family and home environment[,]" the "extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected him[,]" as well as the "possibility of rehabilitation[.]" *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468. The sentencing court was *required* under Maryland Rule 4-342 to consider mitigating information presented by defense counsel prior to sentencing.[3] *See Mainor v. State*, 475

---

[3] At the time of the Petitioner's sentencing hearing, Maryland Rule 4-342 provided, in relevant part:

(b) **Statutory sentencing procedure.** When a defendant has been found guilty of murder in the first degree and the State has given timely notice of intention to seek a sentence of imprisonment for life without the possibility of parole, but has not given notice of intention to seek the death penalty, the court shall conduct a sentencing proceeding, separate from the proceeding at which defendant's guilt was adjudicated, as soon as practicable after the trial to determine whether to impose a sentence of imprisonment for life or imprisonment for life without parole.

\*      \*      \*

(f) **Allocution and information in mitigation**. Before imposing sentence, the court shall afford the defendant the opportunity, personally and through
(continued . . .)

Md. 487, 502, 257 A.3d 648, 656 (2021) ("[T]he trial judge has to consider mitigating evidence when it is offered[]" prior to sentencing) (quoting *Jones v. State*, 414 Md. 686, 701, 997 A.2d 131, 139 (2010)); *see also Kent v. State,* 287 Md. 389, 393, 412 A.2d 1236, 1238 (1980). "Trial judges are presumed to know the law and to apply it properly." *State v. Chaney*, 375 Md. 168, 179, 825 A.2d 452, 458 (2003) (quoting *Ball v. State*, 347 Md. 156, 206, [699 A.2d 1170, 1194] (1997)). We must therefore presume the sentencing court considered the mitigating arguments proffered by defense counsel based on Petitioner's youth and attendant circumstances.

The record reflects the sentencing court, in its exercise of sound discretion, determined that despite the mitigating factors presented surrounding Petitioner's youth, the severity of his crimes warranted the punishment of life in prison without the possibility of parole.[4] The Eighth Amendment did not prohibit it from making this judgment. *See Miller*,

---

(. . . continued)

> counsel to make a statement and to present information in mitigation of punishment.

Md. Rule 4-342 (2006 Repl. Vol.). The present form of the Rule remains largely the same. *See* Md. Rule 4-342 (2022 Repl. Vol.).

[4] This is plainly demonstrated in the statement the sentencing court made to Petitioner immediately prior to issuing its decision:

> It appears you've changed since you were first taken into custody in 2002. As a child, you had no one to establish values or foundations for you. After you met John Allen Muhammad and became influenced by him, your chances for successful life became worse than they already were.
> (continued . . .)

567 U.S. at 480, 132 S. Ct. at 2469 ("[W]e do not foreclose a sentencer's ability to make that judgment [that a juvenile offender's crime warrants life without parole] in homicide cases[.]"). *Miller* itself contemplates a circumstance very similar to Petitioner's as one that would likely warrant a sentencer making the judgment that this most extreme sentence is appropriate. In a footnote replying to arguments made by dissenting Justices, the Court stated:

> Given our holding, and the dissents' competing position, we see a certain irony in their repeated references to 17–year–olds who have committed the "most heinous" offenses, and their comparison of those defendants to the 14–year–olds here. *See post*, at 2477 (opinion of ROBERTS, C.J.) (noting the "17–year old [who] is convicted of deliberately murdering an innocent victim"); *post*, at 2478 ("the most heinous murders"); *post*, at 2480 ("the worst types of murder"); *post*, at 2489 (opinion of ALITO, J.) (warning the reader not to be "confused by the particulars" of these two cases); *post*, at 2489 (discussing the "17 1/2–year–old who sets off a bomb in a crowded mall"). Our holding requires factfinders to attend to *exactly such circumstances—to take into account the differences among defendants and crimes.*

---

(. . . continued)

> You could have been somebody different. You could have been better. What you are, however, is a convicted murderer. You will think about that every day for the rest of your life. You knowingly, willingly, and voluntarily participated in the cowardly murders of innocent, defenseless human beings.

> You've shown remorse and you've asked for forgiveness. Forgiveness is between you and your God, and personally, between you and your victims, and the families of your victims. This community, represented by its people and the laws, does not forgive you.

> You've been held accountable for the crimes you've committed here. You will receive the maximum sentence allowed by the law of this State.

*Miller*, 567 U.S. at 480 n.8, 132 S. Ct. at 2469 n.8 (emphasis added). Petitioner was four months away from his eighteenth birthday when these heinous crimes were committed. If this is not one of the circumstances where a sentencing court could determine that, despite mitigating factors pertaining to juvenile offender's youth, life without parole was still warranted, there is no circumstance where it would be warranted.

### Petitioner's crimes were not reflective of transient immaturity and his sentences were not unconstitutionally disproportionate as applied

In concluding Petitioner's sentences are likely violative of the Eighth Amendment, the Majority relies on a footnote in *Jones*, quoting *Montgomery*, which states, "[t]hat *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Jones*,___ U.S. at ___ n.2, 141 S. Ct. at 1315 n.2 (quoting *Montgomery*, 577 U.S. at 211, 136 S. Ct. at 735). The Majority asserts that because the sentencing judge *may* have found Petitioner to be corrigible, it is at least unclear whether his sentence was constitutionally proportionate. *Malvo*, op. at 25–26. Although not termed as such by the Majority, this amounts to a finding that a sentence of life in prison without the possibility of parole was potentially disproportionate as-applied to Petitioner.[5] *See Jones*, ___ U.S. at ___ n.8, 141

---

[5] Petitioner also phrases this argument as an as-applied argument in his brief. Notably, the United States Supreme Court has never expressly adopted a heightened as-applied challenge for disproportionality under the Eighth Amendment for juveniles sentenced to life in prison without the possibility of parole. *See Jones*, ___ U.S. at ___, 141 S. Ct. at 1322 ("[T]his case does not properly present—and thus we do not consider— any as-applied Eighth Amendment claim of disproportionality regarding Jones's

(continued . . .)

S. Ct. at 1337 n.8 (Sotomayor, J., dissenting) ("In the context of a juvenile offender, [an as-applied Eighth Amendment claim of disproportionality] should be controlled by this Court's holding that sentencing a child whose crime reflects transient immaturity to life without parole . . . is disproportionate under the Eighth Amendment.") (internal citations and quotations omitted).

An as-applied challenge of disproportionality considers whether a sentence is proportionate to the *crime committed*. *See State v. Stewart*, 368 Md. 26, 32, 791 A.2d 143, 146 (2002) ("[A] detailed proportionality review based on the criteria set out in *Solem* is appropriate only in the rare case in which a threshold comparison of the *crime committed* and the *sentence imposed* leads to an inference of gross disproportionality.'") (emphasis added) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1005, 111 S. Ct. 2680, 2707 (1991) (Kennedy, J., concurring)). *Montgomery* held that it is disproportionate under the Eighth Amendment to sentence "a child whose *crime* reflects transient immaturity to life without parole." 577 U.S. at 211, 136 S. Ct. at 735 (emphasis added). This does not equate to a determination that any juvenile offender who has ever shown himself to be "corrigible," is

_____

(. . . continued)

sentence[.]") (citing *Harmelin*, 501 U.S. at 996–1009, 111 S. Ct. 2680 (1991) (Kennedy, J., concurring in part and concurring in judgment)); *see also* William W. Berry, *The Evolving Standards, As Applied*, FLORIDA L. REV. (July 15, 2021) (forthcoming, available at SSRN: https://perma.cc/7FRF-BNVJ) at *29 (acknowledging the United States Supreme Court has "not articulated, in a majority opinion, the approach for an individual as-applied challenge" to a sentence of life in prison without the possibility of parole for a juvenile). Regardless, as articulated by Justice Sotomayor in her dissenting opinion, *see* Jones, ___ U.S. at ___ n.8, 141 S. Ct. at 1337 n.8 (Sotomayor, J., dissenting), the quote from *Montgomery* relied upon by the majority would amount to an as-applied test of proportionality under the Eighth Amendment.

prohibited from receiving a sentence of life in prison without the possibility of parole, regardless of the severity of their crimes. Such a categorical prohibition conflicts with *Jones*'s holding that there is *no* requirement for a sentencing court to make a finding, either explicitly or implicitly, of permanent incorrigibility prior to sentencing a juvenile offender to life in prison without the possibility of parole. *See Jones*, ___ U.S. at ___, 141 S. Ct. at 1313, 1319, 1322 (rejecting claims it was overruling *Miller* and *Montgomery* and stating "[w]e instead rely on what *Miller* and *Montgomery* said—that is, their explicit language addressing the precise question before us and *definitively rejecting any requirement of a finding of permanent incorrigibility*[]") (emphasis added).

I cannot agree Petitioner's crimes reflected "transient immaturity[,]" *Jones*, ___ U.S. at ___ n.6, 141 S. Ct. at 1337 n.6 (Sotomayor, J., dissenting), meriting a determination that his sentences were grossly disproportionate as applied. As explained above, we are concerned with whether the severity of sentence imposed is grossly disproportionate to the severity of the *crime committed*, and whether the *crime committed* is indicative of transient immaturity. In order to render this determination, it is helpful to revisit Judge Moylan's discussion in *Muhammad* of the crimes committed by Petitioner in Maryland:

> Although the reign of terror perpetrated by Muhammad and Malvo ultimately spread over seven separate jurisdictions and involved [ten] murders and [three] attempted murders, the epicenter was unquestionably Montgomery County. Six of the ten murders were committed in Montgomery County. The terror began in Montgomery County on Wednesday evening, October 2, 2002. The terror ended in Montgomery County on Tuesday evening, October 22, 2002.
>
> Seized with epidemic apprehension of random and sudden violence, people were afraid to stop for gasoline, because a number of the shootings had occurred at gas stations. Schools were placed on lock-down status. On one

17

occasion, Interstate 95 was closed in an effort to apprehend the sniper. A multi-jurisdictional state and federal task force was formed to cope with the crisis. "Hot lines" to receive tips were created by both the Montgomery County Police Department and the Federal Bureau of Investigation. Over 60,000 tips were ultimately received. The sense of dread that hovered over the entire community was immeasurable. The six lives that were taken were but a part of an incalculable toll.

## 1. James Martin

James Martin was a systems analyst for the National Ocean and Atmospheric Administration. At just after 6 P.M. on October 2, 2002, he was standing in the parking lot of a Shoppers Food Warehouse in Wheaton. Three witnesses heard a "loud bang" as Martin clutched his chest, gave a cry for help, and collapsed to the ground. He died almost immediately from a bullet fired into his back.

It was determined that the shot had been fired from the rear of the parking lot. There was later recovered from Muhammad and Malvo, on October 24, a Bushmaster XM–15 semiautomatic .223–caliber rifle with a muzzle velocity of approximately 3,000 feet per second. The autopsy of Martin showed that his injuries were consistent with those inflicted by a .223–caliber bullet fired from a Bushmaster rifle. The medical examiner testified that a .223–caliber bullet fired by a high velocity weapon leaves a distinctive and extremely devastating injury, as it did to Martin, because the bullet fragments when it hits the body, causing "a tremendous amount of damage."

\* \* \*

## 2. James Buchanan

The senseless killing of October 2 escalated into a murderous rampage by the morning of October 3. James Buchanan, who owned and operated a landscaping business, was mowing the lawn at the Fitzgerald Auto Store near the White Flint Mall at about 7:45 A.M. Gary Huss, an employee at the auto store, heard a "loud bang" but looked around and saw nothing. A minute or two later, another employee rushed into his office and said that "someone was dead on the parking lot." Another employee had also heard a "loud shotgun blast" and saw Buchanan grab his chest, stumble toward the gate, and fall. Buchanan lay dead with a "huge wound" to his chest. The post-mortem examination revealed that a single bullet had entered Buchanan's body from the back. The wound was consistent with one caused by a .223 rifle shot fired by a high velocity weapon.

### 3. Premkumar Walekar

No more than 40 minutes after Buchanan was killed, Premkumar Walekar, a taxi driver, was filling his car with gasoline at a nearby Mobil station.  Dr. Caroline Namrow was also at the gas station when she heard a "very loud bang" and then saw Walekar walk toward her, pleading, "Call an ambulance."  Walekar collapsed to the ground and Dr. Namrow called 911 on her cell phone.  She then attempted to administer CPR, but to no avail. Walekar was pronounced dead en route to the hospital.

The autopsy revealed that the fatal wound was from a long-range shooting. The examiner described a wound showing a "lead snowstorm" effect inside Walekar's chest, consistent with the firing of a high velocity rifle, such as a .223 rifle.  After the October 24 arrest of Muhammad and Malvo, a ballistics examination showed that the lead fragments found in Walekar's chest had definitely been fired from the Bushmaster rifle recovered from Muhammad's car.

### 4. Maria Sarah Ramos

Less than 30 minutes later, Maria Sarah Ramos, a 32–year–old wife and mother who worked as a housecleaner, was shot through the head and died instantly.  She was sitting on a bench at Leisure World Plaza, waiting for her employer to pick her up.  A resident of a nearby retirement community was walking to the mailbox when he heard a "huge explosion" and saw Mrs. Ramos "slump over" with blood "pouring from her head."

*    *    *

### 5. Lori Lewis Rivera

Lori Lewis Rivera was a 25–year–old nanny who was vacuuming her mini-van at a Shell station when she was fatally shot in the back a few minutes after 10 A.M. that same day.  Maria Welsh had been loading groceries into her car on the parking lot of a Safeway store just behind the Shell station on Connecticut Avenue when she heard a "loud bang."  As she drove away from the Safeway, she saw a woman lying on the ground near the vacuum cleaner at the nearby Shell station.  The woman was calling for help, and Ms. Welsh called 911.  When help arrived, Ms. Rivera had no pulse.

The autopsy revealed a gunshot wound to the back with no exit wound.  The wound was consistent with one inflicted by a high velocity rifle.  The

ballistics examination revealed that the bullet taken from Ms. Rivera had been fired from John Muhammad's Bushmaster rifle.

*    *    *

**6. Conrad Johnson**

By the night of October 3, the vortex of carnage had moved beyond Montgomery County into 1) the District of Columbia; 2) Prince George's County, Maryland; and 3) four separate counties in northern Virginia. For the last of the [thirteen] shootings and [ten] murders, however, the scene of the crime, on October 22, returned to Montgomery County. At just before six A.M., Conrad Johnson, a husband and father of two sons and a bus driver, was shot while stepping out of his bus. A police officer found Johnson lying on the floor of the bus, bleeding from his chest but still conscious. Doctors were unable to control the extensive hemorrhaging and Johnson died on the operating table. The ballistics examination confirmed that the bullet that killed him had been fired by John Muhammad's Bushmaster rifle.

The officers who responded to the scene of the shooting searched a nearby wooded area. They found a black duffel bag, a single left-handed brown glove, and a note which had been placed inside two plastic ziplock bags and attached to a tree. What turned out to be Malvo's DNA was found on one of the ziplock bags and on the glove. Muhammad could not be excluded as the source of DNA extracted from a hair found on the duffel bag. The note declared, as had two earlier notes in Prince George's County and in Ashland, Virginia, "For you, Mr. Police, call me God." The note also taunted the police for their "incompetence" and warned that "Your children are not safe. Can you hear us now? Do not play these childish games with us. You know our demands. Thank you." The note concluded, "Next person, your choice."

177 Md. App. at 200–04, 934 A.2d at 1066–69. Petitioner was four months shy of his eighteenth birthday when he participated in the intentional execution of six individuals in Maryland, at complete random, while they went about their daily lives. Between each murder, he had the opportunity to stop, reflect, and consider what he was he was doing. As aptly stated by Judge Moylan, "[t]he six lives that were taken were but a part of an incalculable toll[]" that froze and terrorized an entire community. *Id.* at 200, 934 A.2d at

20

1066. These were not the only murders committed by Petitioner and Mr. Muhammad. More murders were planned, and no doubt would have been carried out had law enforcement not finally apprehended them on October 24, 2002.

In determining whether Petitioner's crimes were representative of "transient immaturity," it is relevant that Petitioner was nearly an adult. It is relevant that he killed, not only the six people in Montgomery County, but four others in Virginia and the District of Columbia,[6] and attempted to kill three others, including a thirteen-year-old student in Prince George's County.[7] *Id.* at 207, 934 A.2d at 1070. It is relevant each of the killings

---

[6] Petitioner has also confessed to murders committed in Washington State, Arizona, Louisiana, and Alabama, and is suspected of more. *See* Josh White, *Lee Boyd Malvo, 10 years after D.C. area sniper shootings: 'I was a monster'*, WASH. POST (Sept. 29, 2012) https://perma.cc/TJF9-UZ92; *Belway Snipers*, FEDERAL BUREAU OF INVESTIGATION, https://perma.cc/REN4-Y9YY (last visited Apr. 11, 2022); Arthur H. Rotstein, *Convicted sniper confesses to 2002 Arizona killing, police say*, THE SEATTLE TIMES (Oct. 28, 2006, 12:00 AM) https://perma.cc/HPC8-NYAW; Eliott C. McLaughlin, *Sniper's apology brings closure, no justice*, CNN (Mar. 4, 2010, 9:54 AM) https://perma.cc/8MPJ-QBSF.

[7] Judge Moylan described that shooting as follows:

Thirteen-year-old Iran Brown was dropped off by his aunt at the Benjamin Tasker Middle School in Prince George's County, Maryland, at approximately 8 A.M. on October 7. As he waited in front of the school for the doors to be opened, he heard a loud bang and felt a sharp and sudden pain in his chest. He remembered nothing further until he woke up in the Children's Hospital one week later. His aunt testified that just after she dropped Iran off, she heard him screaming her name and saw him lying on the ground. She rushed him to the clinic just around the corner and called 911. Iran remained hospitalized for approximately two months. He suffered damage to many of his internal organs; he lost his spleen, parts of his pancreas and liver, and 80% of his stomach. The ballistics examination revealed that the bullet that pierced his body had been fired from John Muhammad's Bushmaster rifle.

*Muhammad*, 177 Md. App. at 207, 934 A.2d at 1070.

were perpetrated in a removed, calculated, and repeated fashion, after which Petitioner had the opportunity to stop and reflect about what he had done, and affirmatively chose to continue. Under these circumstances, I cannot agree Petitioner's crimes were indicative of "transient immaturity" such that his sentences of life in prison without the possibility of parole are unconstitutionally disproportionate. [8]

The comments made by the circuit court during Petitioner's sentencing proceeding do not suggest otherwise as to require Petitioner's resentencing. The court found that Petitioner "*knowingly, willingly, and voluntarily* participated in the cowardly murders of innocent, defenseless human beings." (Emphasis added). The State likewise characterized Petitioner's crimes as perpetrated by a "cognizant, thinking, and deliberate 17-year-old" that was "without mental defect" and who should "bear full responsibility for his criminal actions." Petitioner's culpability in front of his crimes was not negated simply because the sentencing court and the State acknowledged Petitioner had "changed" since coming into custody. Neither does that recognition equate to a determination that Petitioner's crimes were the result of "transient immaturity." I therefore reject the Majority's conclusion that that Petitioner's sentences were disproportionate as applied under the Eighth Amendment.

---

[8] In passing JUVRA, the General Assembly prohibited imposing sentences of life in prison without the possibility of parole for juvenile offenders sentenced after October 1, 2021. *See* Md. Code, Criminal Procedure § 6-235; 2021 Maryland Laws Ch. 61 (S.B. 494). Thus, the new sentencing court will no longer have the discretion to determine that Petitioner should be given the same sentences he previously received.

22

**Petitioner's sentences did not violate Article 25**

Article 25 of the Maryland Declaration of Rights, which prohibits the imposition of "cruel or unusual punishments[,]" does not provide Petitioner with any greater protection than the Eighth Amendment. Petitioner argues because Article 25 uses the conjunction "or" between the terms "cruel" and "unusual," it provides greater protection than its Eighth Amendment parallel, which uses the term "and" between the terms "cruel" and "unusual". Petitioner also alleges our practice of interpreting Article 25 *in pari materia* with the Eighth Amendment has only occurred in the context of sentences for adult offenders, and Maryland has traditionally provided greater protections for juvenile offenders.

Contrary to Petitioner's assertion, we have interpreted Article 25 *in pari materia* with the Eighth Amendment when considering the constitutionality of sentences for juvenile offenders. In *Carter v. State*, 461 Md. 295, 192 A.3d 695 (2018), we considered the federal and state constitutional limits of sentences for three juvenile offenders. *Id.* at 306–08, 192 A.3d at 701–02. In setting the constitutional standard, we discussed Article 25 and stated although "there is some textual support for finding greater protection in the Maryland provisions[,]" Article 16[9] and Article 25 "have usually been construed to provide the same protection as the Eighth Amendment[.]" *Id.* at 308 n.6, 192 A.3d at 702 n.6. In so holding, we relied on *Thomas v. State*, which held:

---

[9] Article 16 of the Maryland Declaration of Rights provides: "[t]hat sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter." Petitioner does not advance any arguments premised on Article 16, so it need not be addressed.

23

> Our cases interpreting Article 25 of the Maryland Declaration of Rights have generally used the terms "cruel and unusual" and "cruel or unusual" interchangeably. The Court of Special Appeals has suggested that "the adjective 'unusual' adds nothing of constitutional significance to the adjective 'cruel' which says it all, standing alone." Because the prevailing view of the [United States] Supreme Court recognizes the existence of a proportionality component in the Eighth Amendment, we perceive no difference between the protection afforded by that amendment and by the 25th Article of our Declaration of Rights.

333 Md. 84, 103 n.5, 634 A.2d 1, 10 n.5 (1993) (internal citations omitted) (quoting *Walker v. State*, 53 Md. App. 171, 193 n.9 452 A.2d 1234, 1245 n.9 (1982)). Although Petitioner attempts to distinguish *Thomas* on the grounds that it is applicable only to sentences for adults, our holding in *Carter*, where we expressly applied its reasoning in the context of juvenile offenders, demonstrates otherwise.

Petitioner does not offer a compelling reason to depart from our well-established precedent and hold that Article 25 provides greater protection for juvenile offenders than the Eighth Amendment. Petitioner's textual argument has already been considered and dismissed in *Thomas*, as noted above. 333 Md. at 103 n.5, 634 A.2d at 10 n.5. There, we explained the term "unusual" likely adds nothing of constitutional significance to the word "cruel". *Id.*, 634 A.2d at 10 n.5; *see also*, Ronald J. Mann, *The Individualized-Consideration Principle and the Death Penalty As Cruel and Unusual Punishment*, 29 HOUS. L. REV. 493, 496 n.8 (1992) (explaining the word "unusual" as it appears in the Eighth Amendment may not have any independent meaning, as the United States Supreme Court "generally has not endeavored to articulate a separate requirement based on the word 'unusual,' but has proceeded by analyzing the word 'cruel'").

24

The examples given by Petitioner of instances where Maryland has provided heightened protections for juvenile offenders are all instances where the General Assembly has legislatively chosen to do so, not when this Court has done so through an expansive interpretation of the Maryland Constitution.[10] Fundamentally, they do not support Petitioner's interpretation of Article 25.

**JUVRA cures any alleged deficiencies in Petitioner's Sentence**

The General Assembly has most recently provided additional protections for juvenile offenders through JUVRA, codified in Md. Code, Criminal Procedure ("Crim. Proc.") §§ 6-235; 8-110. *See* 2021 Md. Laws, Ch. 61. Crim. Proc. § 8-110 provides juvenile offenders who have been sentenced prior to October 1, 2021, like Petitioner, automatically become eligible to have their sentences reduced after serving twenty years in prison. The General Assembly has provided Petitioner with an avenue which, although not guaranteed, may lessen his sentences.

---

[10] Specifically, Petitioner mentions:

Maryland was one of the first States to pass legislation establishing a "House of Refuge for Juvenile Delinquents," Acts of 1830, ch. 64, as part of a progressive movement that sought to "rescue children from the degradations of adult prison." Nell Bernstein, *Burning Down the House: The End of Juvenile Prison* 38 (2014). Maryland was one of the first States to create a specialized court for juvenile offenders. *See* Acts of 1902, ch. 611. Maryland banned capital punishment for juvenile offenders nearly two decades before *Roper* held that this practice was "cruel and unusual." *See* Acts of 1987, ch. 626.

(Footnote omitted).

25

In that manner, JUVRA could be said to remedy any alleged constitutional defect regarding Petitioner's sentences. The United States Supreme Court in *Montgomery* made clear that resentencing is not necessary to cure a *Miller* violation. In *Carter*, we explained that a violation of *Miller* may be remedied by permitting the offender a "'meaningful opportunity to obtain release based on demonstrated maturity or rehabilitation' – by parole *or otherwise*." 461 Md. at 340, 192 A.3d at 720 (emphasis added). As discussed above, Petitioner is not constitutionally entitled to meaningful opportunity for release, and the sentences he received met the requirements of the Eighth Amendment and Article 25. Nonetheless, JUVRA still provides him with such an opportunity through the possibility of a sentence reduction.

Petitioner argues JUVRA does not grant him a meaningful opportunity to obtain release because he has not begun to serve his sentences in Maryland. He contends that, at a minimum, he would not become eligible for a sentence reduction under the statute for another twenty years, and indeed, may never serve his Maryland sentences if he is not granted parole in Virginia. The fact that Petitioner was convicted, sentenced, and is presently incarcerated for crimes he committed in other states has no effect on the legality of his sentences in Maryland.

Petitioner also argues it is not clear whether he would be required to serve twenty years for each of his six life sentences before becoming eligible for a sentence reduction under JUVRA. In *Carter*, we explained:

> There may be any number of circumstances under which an inmate – adult or juvenile – comes to be serving consecutive sentences that add up to a lengthy term of incarceration. At one end of the spectrum, an individual may

26

embark on a serious crime spree, involving, for example, a series of armed robberies or sexual assaults over weeks or months or even years. Whether the crimes are prosecuted together or separately, the courts may sentence the individual to significant periods of incarceration for each incident. These circumstances are least likely to warrant the aggregate sentence being treated as a *de facto* life sentence. *The number of crimes, their seriousness, and the opportunity for the juvenile to reflect before each bad decision also makes it less likely that the aggregate sentence is constitutionally disproportionate even after taking youth and attendant characteristics into account.*

461 Md. at 356–57, 192 A.3d at 731 (emphasis added). Petitioner's crimes undoubtably fall under the "serious crime spree" end of the spectrum, as Petitioner committed six murders in Maryland and had the opportunity to reflect between each of them. Insofar as Petitioner's eligibility for a sentence reduction under JUVRA after twenty years is akin to a term of years sentence, being required to a serve minimum of twenty years for each of those six sentences still does not amount to a *de facto* life sentence under *Carter*.

**CONCLUSION**

As reflected above, the Eighth Amendment requires only that Petitioner received an individualized sentencing proceeding in which the sentencing court had discretion to give him a sentence amounting to less than life in prison without the possibility of parole. Petitioner received such a proceeding. It is also evident, both because the sentencing court had discretion and from the record itself, that the court considered Petitioner's youth and attendant characteristic prior to sentencing him. Any alleged finding of "corrigibility" did not render Petitioner's sentences unconstitutionally disproportionate as applied. Rather the proportionality of Petitioner's sentences must be weighed against the severity of his crimes. Petitioner committed some of the worst crimes in the history of the State. It was not grossly disproportionate that a heavy penalty was imposed. Article 25 of the Maryland

27

Declarations of Rights does not provide Petitioner any greater protection than the Eighth Amendment. Finally, any alleged constitutional insufficiency has been cured by the General Assembly's passage of JUVRA. Respectfully, I dissent and would affirm the sentences imposed on Petitioner by the circuit court.

Judge Gould has authorized me to state that he joins in this opinion.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/29a21cn.pdf